ROBERTO SÁNCHEZ VILELLA, NOEL COLÓN MARTÍNEZ, demandantes y apelantes, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO, COMISIÓN ESTATAL DE ELECCIONES, HON. JUAN R. MELECIO, en su capacidad de PRESIDENTE DE LA COMISIÓN ESTATAL DE ELECCIONES, CARLOS CANALS, en su capacidad de COMISIONADO ELECTORAL DEL PARTIDO NUEVO PROGRESISTA, ARIEL NAZARIO, en su capacidad de COMISIONADO DEL PARTIDO POPULAR DEMOCRÁTICO, MANUEL RODRÍGUEZ, en su capacidad de COMISIONADO ELECTORAL DEL PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO, demandados y apelados; ROBERTO SÁNCHEZ VILELLA, NOEL COLÓN MARTÍNEZ, demandantes y apelantes, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO, COMISIÓN ESTATAL DE ELECCIONES, HON. JUAN R. MELECIO, en su capacidad de PRESIDENTE DE LA COMISIÓN ESTATAL DE ELECCIONES, CARLOS CANALS, en su capacidad de COMISIONADO ELECTORAL DEL PARTIDO NUEVO PROGRESISTA, ARIEL NAZARIO, en su capacidad de COMISIONADO ELECTORAL DEL PARTIDO POPULAR DEMOCRÁTICO, MANUEL RODRÍGUEZ, en su capacidad de COMISIONADO ELECTORAL DEL PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO, demandados y apelados; FEDERACIÓN DE UNIVERSITARIOS PRO-INDEPENDENCIA, interventora y apelante.

*Números:* AC-93-654  
AC-93-644

*Resueltos:* 4 de noviembre de 1993

*Carlos A. Del Valle Cruz, Salvador Tió, Jesús R. Morales Cordero* y *Celina Romany,* abogados de los apelantes; *David Rivé Rivera,* abogado de la apelada Comisión Estatal de Elecciones y de su Presidente; *Carlos Lugo Fiol, Procurador General Interino,* abogado del apelado Estado Libre Asociado de Puerto Rico; *José Ariel Nazario* y *Carlos I. Gorrín Peralta,* abogados del apelado Manuel Rodríguez Orellana; *Mario Arroyo Dávila, Rafael L. Martínez Torres* y *Pedro A. Delgado Hernández,* abogados del apelado Carlos Canals Mora; *José Nicolás Medina Fuentes,* abogado de la interventora y apelante Federación de Universitarios Pro–Independencia.

PER CURIAM: El pasado 28 de octubre de 1993 los electores Roberto Sánchez Vilella y Noel Colón Martínez recurrieron ante este Tribunal y solicitaron la revocación de la sentencia del Tribunal Superior, Sala de San Juan, que desestimó por falta de legitimación activa su demanda entablada contra el Estado Libre Asociado de Puerto Rico, la Comisión

Estatal de Elecciones (en adelante C.E.E.), el Hon. Juan R. Melecio, en su carácter de Presidente de la C.E.E., y los Comisionados Electorales del Partido Nuevo Progresista (en adelante P.N.P.), Partido Popular Democrático (en adelante P.P.D.) y el Partido Independentista Puertorriqueño (en adelante P.I.P.). Solicitaron que se declararan inconstitucionales los Arts. 1, 8 y 19 de la Ley Núm. 22 de 4 de julio de 1993 (1993 Leyes de Puerto Rico 101) y que se emitiera un interdicto permanente para impedir su ejecución. Revocamos.

I

El 4 de julio de 1993 la Asamblea Legislativa aprobó la Ley Núm. 22, *supra*, que autoriza la celebración de un plebiscito el próximo 14 de noviembre de 1993, en el cual los electores debidamente inscritos podrán seleccionar entre las fórmulas tradicionales de *status* siguientes: Estadidad, Estado Libre Asociado e Independencia.

Conforme al Art. 4 de la ley, 1993 Leyes de Puerto Rico 104, el 15 de septiembre de 1993, la C.E.E. convocó oficialmente su celebración. Ese mismo día, los electores Sánchez Vilella y Colón Martínez presentaron su demanda. Alegaron (1) que eran electores debidamente inscritos para participar en dicho plebiscito; (2) que no estaban afiliados a ninguno de los tres (3) partidos políticos; (3) que no estaban de acuerdo con las definiciones de las fórmulas de *status* sometidas por dichos partidos políticos conforme al procedimiento dispuesto por los Arts. 1 y 3 de la Ley Núm. 22 (1993 Leyes de Puerto Rico 101); (4) que dicha ley no les concedía oportunidad alguna de votar por las alternativas de su preferencia, y (5) que violaba su derecho al voto, a la libre expresión y asociación, y a la igual protección de las leyes, protegidos tanto por la Constitución del Estado Libre Asociado de Puerto Rico como por la Constitución de Estados Unidos de América.

El 21 de septiembre de 1993 el Tribunal Superior celebró una vista en la que no recibió prueba y se limitó a escuchar los argumentos de las partes. La Federación Universitaria de Estudiantes Pro Independencia (en adelante F.U.P.I.) compareció mediante demanda de intervención conforme a la Regla 21 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Al igual que los señores Sánchez Vilella y Colón Martínez, alegó que la Ley Núm. 22, *supra*, le impedía a sus miembros votar por la alternativa de *status* que ellos profesan.

Considerados los memorandos de derecho en apoyo y oposición a la solicitud de interdicto y las mociones de desestimación de la C.E.E., los comisionados electorales del P.N.P. y el P.I.P., y la solicitud de sentencia sumaria de la F.U.P.I., el Tribunal Superior desestimó la demanda. Resolvió que los señores Sánchez Vilella y Colón Martínez carecían de legitimación activa para ejercer las acciones pretendidas y denegó la solicitud de intervención de la F.U.P.I.

No conformes, presentaron sendos recursos de apelación en los cuales solicitaron la revocación de la sentencia recurrida. Ordenamos su consolidación y concedimos a los demandados-recurridos hasta el 2 de noviembre de 1993 para expresar sus posiciones. Además, celebramos ayer una vista oral.

Con el beneficio de los alegatos de las partes y de los argumentos presentados por éstas en la vista oral, y conscientes de la urgencia requerida, resolvemos prontamente.

## II

En primer lugar, el Tribunal Superior incidió al concluir que los electores Sánchez Vilella y Colón Martínez carecían de legitimación activa. El Art. 2.001 de la Ley Electoral de Puerto Rico, Ley Núm. 4 de 20 de diciembre de 1977, según enmendada, 16 L.P.R.A. sec. 3051, le concede la capacidad para promover toda acción legal para salva-

guardar su derecho al voto universal, igual, directo y secreto. Este derecho es de estirpe constitucional, expresamente consagrado en el Art. II, Sec. 2 de nuestra Constitución, L.P.R.A., Tomo 1, ed. 1982, pág. 261, el cual dispone:

Las leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral.

Así aclarado, resolvemos que el tribunal a quo erró al denegar la solicitud de intervención de la F.U.P.I., toda vez que la misma procedía conforme a la Regla 21.2(b) de Procedimiento Civil, 32 L.P.R.A. Ap. III.

### III

Concentrémonos en los méritos de la controversia central. Tanto nuestro ordenamiento constitucional como el norteamericano han reconocido a cabalidad la condición fundamental y preeminente del derecho al sufragio. El Preámbulo de nuestra Constitución destaca su importancia para el sistema democrático al enunciar que "el orden político está subordinado a los derechos del hombre y donde se asegura la libre participación del ciudadano en las decisiones colectivas ...". Preámbulo, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 251.

Estos postulados constitucionales protegen y garantizan el derecho al sufragio universal, tanto en las elecciones generales como en los referéndum y en los plebiscitos. Aunque no es derecho de carácter absoluto y la Legislatura tiene amplia facultad para reglamentarlo, le corresponde a los tribunales la responsabilidad de asegurar que la legislación promulgada cumpla con las garantías constitucionales. Al descargar esta responsabilidad tenemos que hacer un delicado balance entre el derecho fundamental al sufragio y el interés del Estado en reglamentar

su ejercicio para que el proceso se conduzca ordenadamente con la mayor participación de electores en igualdad de condiciones. Véase, a modo ilustrativo, *Anderson v. Celebrezze*, 460 U.S. 780 (1983). *Cada decisión debe tomarse con cuidado, atendiendo a las circunstancias particulares de cada caso. Como principio general, aquella legislación que sea onerosa y afecte sustancialmente el derecho al sufragio es susceptible de impugnación constitucional.*

Por la importancia que tiene en nuestra vida democrática una contienda de carácter electoral, hemos ejercido con mucha prudencia el poder de revisar controversias que surgen en las elecciones, los referéndum o los plebiscitos. Por otro lado, en materia de hermenéutica constitucional y ante estatutos que adolecen de inconstitucionalidad por subinclusión, hemos reconocido nuestra facultad de extender los beneficios estatutarios a aquellos grupos o clases excluidas. *Milán Rodríguez v. Muñoz*, 110 D.P.R. 610, 618 (1981). Esta normativa es aplicable a las leyes electorales.

Considerados los hechos particulares del caso de autos,[1] y con el propósito de superar las serias objeciones constitucionales planteadas por los demandantes, quienes no están de acuerdo con las definiciones partidistas sometidas en virtud de la Ley Núm. 22, *supra*, procede que ordenemos a la C.E.E. que el 14 de noviembre de 1993 adjudique las papeletas que se depositen en blanco como un

---

[1] A pesar de que no se desfiló prueba ante el Tribunal Superior, todas las partes están de acuerdo, según surge de sus alegatos y de sus comparecencias en la vista oral, sobre los hechos siguientes: (1) que los señores Sánchez Vilella y Colón Martínez son electores debidamente inscritos para participar en dicho plebiscito; (2) que no están afiliados a ninguno de los tres (3) partidos políticos; (3) que no están de acuerdo con las definiciones de las fórmulas de *status* sometidas por dichos partidos políticos conforme al procedimiento dispuesto por los Arts. 1 y 3 de la Ley Núm. 22 de 4 de julio de 1993, Leyes de Puerto Rico 101, y (4) que la Federación de Universitarios Pro-Independencia (F.U.P.I.) no está de acuerdo con la definición de la fórmula de independencia sometida por el Partido Independentista Puertorriqueño (P.I.P.) de acuerdo con dicha ley. Regla 1 de Procedimiento Civil, 32 L.P.R.A. Ap. III.

voto que no favorece ninguna de las definiciones de *status* propuestas por los partidos.([2])

A los fines de hacer eficaz este mandato, la C.E.E. y su Presidente deberán adoptar todas las medidas razonables a su alcance para informar a todos los electores del país que les asiste el derecho de depositar en las urnas su papeleta en blanco, como medio de expresar que no favorecen ninguna de las definiciones de *status* propuestas por los partidos. La C.E.E. divulgará, tan vigorosamente como le sea posible, el derecho del elector a no marcar la papeleta si no le satisfacen las definiciones aludidas.

Entre las medidas que deberán realizar se ordenan las siguientes:

1.  Colocar anuncios pagados en radio, televisión y en tres (3) periódicos de circulación general diaria a comenzar a más tardar cuarenta y ocho (48) horas después de notificado este dictamen.

2.  Colocar rótulos sobre el particular en cada salón de cada colegio electoral.

3.  Celebrar conferencias de prensa para anunciar estas medidas y el aludido derecho del elector, según aquí configurado.

4.  Tomar cualquier otra medida que estimen necesaria o conveniente para lograr este propósito; en particular, advertir de este derecho a aquellos electores (confinados, policías, etc.) que por virtud de ley o reglamento deberán emitir su voto antes del 14 de noviembre de 1993.

La implantación de este mandato será de la más alta prioridad en el uso y disposición de los fondos que todavía tenga la C.E.E.

*Se expedirá la sentencia correspondiente.*

---

([2])    Nuestra Ley Electoral y el Reglamento General para la Celebración del Plebiscito sobre el *Status* Político de Puerto Rico, aprobado el 21 de julio de 1993, autorizan a los electores a votar en blanco. Art. 6.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3261, y la Regla 50(c) del Reglamento General para la Celebración del Plebiscito sobre *Status* Político de Puerto Rico.

El Juez Asociado Señor Negrón García emitió una opinión disidente y concurrente. El Juez Asociado Señor Rebollo López emitió un voto disidente preliminar. Al amparo de la Regla 4(b) del Reglamento del Tribunal Supremo, todos los Jueces se reservan el derecho a emitir una ponencia luego de la certificación de esta sentencia.

**— O —**

Opinión disidente y concurrente del Juez Asociado Señor Negrón García.

En el fondo estas apelaciones son muestras de las ocasionales intolerancias y abusos del poder público de las mayorías hacia algunas minorías y disidentes; fenómeno que por experiencias judiciales conocemos.

Es *INCONSTITUCIONAL* el denominado *Plebiscito sobre el Status Político de Puerto Rico*, pautado para el próximo 14 de noviembre. De su faz, su ley habilitadora —Ley Núm. 22 de 4 de julio de 1993, Leyes de Puerto Rico, pág. 101— es discriminatoria, asfixia el derecho a la libre expresión, restringe la libertad de asociación y coacciona y anula el derecho al voto de los demandantes apelantes, los electores Roberto Sánchez Vilella y Noel Colón Martínez, al igual que la de aquellos electores miembros de la interventora apelante *Federación de Universitarios Pro-Independencia* (F.U.P.I.).

*Este Plebiscito ha transformado nuestra democracia en una partidocracia* integrada por el Partido Nuevo Progresista (P.N.P.), Partido Popular Democrático (P.P.D.) y Partido Independentista Puertorriqueño (P.I.P.). Se ha "olvida[do] que en el libre intercambio de ideas se apoya todo sistema democrático de gobierno". *Ortiz Angleró v. Barreto Pérez*, 110 D.P.R. 84, 113 (1980), opinión concurrente.

No cuestionamos la facultad de la Asamblea Legislativa de celebrar los referéndum o los plebiscitos *no discriminatorios* sobre el status político. Sólo juzgamos "si los medios

elegidos son compatibles con nuestra Constitución en su proyección multidimensional. Lo contrario es claudicar la función judicial". *P.I.P. v. C.E.E.*, 120 D.P.R. 580, 631 (1988), opinión disidente. Al igual que lo hicimos al sostener la inconstitucionalidad del referéndum celebrado el 8 de diciembre de 1991 —mal llamada *Ley de Garantía de Derechos Democráticos*— el "análisis constitucional se nutre de fundamentos jurídicos; *dejamos a los políticos los restantes argumentos*". (Énfasis suplido.) *Gierbolini Rodríguez v. Gobernador*, 129 D.P.R. 402, 413 (1991), opinión disidente.

## I

La sentencia desestimatoria del Tribunal Superior, Sala de San Juan (Hon. Gilberto Gierbolini, Juez), aún cuando equiparó los reclamos de los demandantes apelantes Sánchez Vilella y Colón Martínez con los de la F.U.P.I., le negó a ésta la intervención "como cuestión práctica y en aras de evitar complicaciones y dilaciones en este pleito ...". Fundado en la *injusta decisión* emitida en *Hernández Torres v. Hernández Colón et al.*, 131 D.P.R. 593 (1992), no le reconoció legitimación activa a los electores Sánchez Vilella y Colón Martínez aduciendo "que no han sufrido daño concreto alguno". Puntualizó que ellos no habían realizado gestión previa para inscribir partido político por petición o para participar en el Plebiscito como *observadores*; por el contrario, habían organizado una agrupación denominada *Coordinadora por la Cuarta Opción* que predica la abstención, lo cual constituía una contradicción al reclamo de una cuarta columna de designación directa (*write-in*).

En lo procesal, el Estado, la Comisión Estatal de Elecciones y los Comisionados Electorales del P.N.P., P.P.D. y P.I.P. insisten en ese predicamento y, además, con mayor o menor vehemencia, como defensas comunes o separadas aducen que los tres (3) partidos principales son parte in-

dispensable, los apelantes Sánchez Vilella y Colón Martínez están en incuria y sus pretensiones implican una cuestión política (*political question*) no justiciable. Examinémoslas suscintamente.

A. Es obvio que el ilustrado foro sentenciador erró al negarles legitimación activa y no permitir intervenir a la F.U.P.I. Si en Puerto Rico no existe el pleito de contribuyentes (*taxpayer suit*); si los legisladores de las minorías no pueden cuestionar las leyes; si una organización estudiantil *bona fide* como la F.U.P.I. ni otros electores cualificados pueden impugnar la Ley Núm. 22, *supra*, ¿quién puede hacerlo? ¿Los partidos P.N.P., P.P.D. y P.I.P., únicos beneficiados ideológica y económicamente?

La doctrina de legitimación activa es solamente *instrumental*. Responde a asegurar que el "promovente de la acción es uno cuyo interés es de tal índole que, con toda probabilidad, habrá de proseguir su causa de acción vigorosamente y habrá de traer a la atención del tribunal las cuestiones en controversias". *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 413 (1982). Y en materia electoral, la balanza siempre la hemos inclinado hacia el elector. *Ortiz Angleró v. Barreto Pérez*, 110 D.P.R. 84 (1980); *P.S.P. v. E.L.A.*, 107 D.P.R. 590 (1978). ¿Qué mayor daño que perder el derecho a votar según los dictados de propia consciencia y libre albedrío? ¿Qué perjuicio más concreto que el Estado no cuente el voto?

Realmente no existe problema alguno en cuanto al aspecto de la legitimación activa (*standing*) de los demandantes Sánchez Vilella, Colón Martínez y miembros de la F.U.P.I. "El sujeto principal de la arquitectura moderna constitucional-electoral tutelado es el *elector individual.*" (Énfasis suplido.) *P.S.P. v. Com. Estatal de Elecciones*, 110 D.P.R. 400, 407 (1980). Como verdaderos destinatarios del sistema, el Art. 2.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3051, *in fine* expresamente les concede como "electores la *capacidad para iniciar o promover cuales-*

*quiera acciones legales* al amparo de [la] *Declaración de Derechos y Prerrogativas de los Electores* ante el Tribunal de Primera Instancia que corresponda". (Énfasis suplido.) Aún así, el tribunal de instancia señaló: "En este caso la Ley Electoral es supletoria y ley general que no aplica en la medida en que sea incompatible con la ley especial." La dificultad de este razonamiento es que dicho foro no consignó en qué consistía la incompatibilidad; tampoco, los demandados nos lo han demostrado, menos la hemos detectado. *No existe ninguna incompatibilidad.*

B.   El planteamiento de falta de parte indispensable es improcedente. Ignora que además de la Comisión Estatal, también fueron demandados y emplazados *separadamente* los Comisionados Electorales del P.N.P., P.P.D. y P.I.P., quienes por ley ostentan oficialmente la representación de esos partidos.

Precisamente se trata de una *investidura legal doble*: una como miembros de la Comisión Estatal de Elecciones encargada de administrar la ley electoral y demás eventos comiciales, tales como la Ley Núm. 22, *supra*, y, otra, para representar y defender los intereses particulares de sus respectivos partidos políticos. 16 L.P.R.A. secs. 3004 y 3012. La cuestión no amerita mayor elucidación.

C.   Tampoco hay *incuria*. La *velocidad y cronología* con que se aprobó la Ley Núm. 22, *supra*, derrotan este planteamiento.

Se recordará que fue aprobada el domingo 4 de julio de este año. Concedió quince (15) días, esto es, hasta el *feriado* lunes 19, para que el P.N.P., P.P.D. y P.I.P. informaran a la Comisión Estatal de Elecciones su interés en participar defendiendo sus respectivas fórmulas de *status*. Art. 9 de la Ley Núm. 22, *supra*. Además, concedió treinta (30) días para que cada uno sometiera a dicha comisión "la definición concisa y clara sobre las fórmulas de *status* político que ellos promulgan". Art. 3 de la Ley Núm. 22, *supra*. Y mediante sorteo, "no antes de quince (15) días y no más

tarde de veinte (20) días después de [su] vigencia", Art. 3, *supra*, la Comisión Estatal de Elecciones adjudicaría los símbolos correspondientes a cada fórmula. *Completado ese trámite*, la Comisión anunciaría mediante proclama, en tres (3) periódicos de circulación general, la celebración del plebiscito "con no menos de sesenta (60) días de anticipación". Art. 4 de la Ley Núm. 22, *supra*. Tomamos conocimiento judicial de que la proclama fue el 15 de septiembre.

*Con vista a esta vertiginosa cronología estatutaria es absurdo e injusto aplicar incuria*. Lo menos que podemos reconocer a los demandantes Sánchez Vilella y Colón Martínez es que su causa de acción no quedó debidamente configurada hasta que se publicó la proclama, el 15 de septiembre, precisamente el día en que presentaron la demanda.

Independientemente de lo expuesto, es imposible negar que al Poder Judicial le ha tomado sesenta (60) días, esto es, dos (2) meses, adjudicarles su caso. No hay el más mínimo indicador objetivo de que de haberse presentado el pleito antes, el Poder Judicial lo hubiese podido hacer más rápido.

Para fines del argumento de incuria, mediante un enfoque de rigurosa matemática, asumamos que los demandantes Sánchez Vilella y Colón Martínez, concediéndoles como mínimo una (1) semana para preparar la demanda —desde el 20 de julio, fecha en que los partidos políticos terminaron el trámite de sus definiciones— diligentemente debieron presentarla el 27 de julio. Aún así, el resultado hubiese sido que los sesenta (60) días de mínima adjudicación judicial se hubiesen cumplido el sábado 25 de septiembre, restando sólo cuarenta y nueve (49) días para la Comisión Estatal de Elecciones implantar cualquier remedio.

Y como informó en la vista oral el Presidente de la Comisión, Lcdo. Juan R. Melecio, y su abogado, Lcdo. David Rivé, los trámites relacionados con la necesidad de pe-

dir el papel especial para las papeletas a Estados Unidos, su impresión —"por lo menos cuarenta y cinco (45) días antes de la fecha en que haya de celebrarse el Plebiscito" (Regla 8 del Reglamento Oficial de las Elecciones Generales de 1988)— y la preparación de miles de paquetes,(1) es una tarea compleja, de meses. Resulta evidente que en nada se hubiese alterado el posible remedio judicial. *La situación de impotencia constitucional que enfrentamos no se debe a la falta de diligencia de los electores Sánchez Vilella y Colón Martínez, sino a los términos perentorios y cortos de la propia Ley Núm. 22, supra.*

El argumento de que debieron fundar o inscribir un partido antes de la Ley Núm. 22, *supra*, es totalmente *inmeritorio*. Repetimos una vez más, las declaraciones de candidatos e ideas en los programas preelectorales de los partidos sólo constituyen política pública oficial cuando se traducen en legislación. "Nuevamente parece olvidado que la *'política pública y la intención legislativa se investigan en los trámites, debates, informes y finalmente en los textos culminantes de los estatutos'. Pueblo v. González Malavé*, 116 D.P.R. 578, 586 (1985)." (Énfasis en el original.) *C.E.S. v. Gobernador I*, 134 D.P.R. 350, 359 (1993), opinión disidente.

Ciertamente, no tenían ningún deber de acudir a la Asamblea Legislativa. ¿Desde cuándo los ciudadanos tienen que comparecer a la casa de las leyes como requisito previo para luego impugnar la constitucionalidad de una ley?

Además, imponerles como alternativa el conformarse con actuar sólo como observadores en el Plebiscito es insuficiente y no supera la inconstitucionalidad. *No es lo mismo ser observador que actor.*

El argumento de incuria pasa por alto que desde princi-

---

(1) El Comisionado Electoral del Partido Nuevo Progresista (en adelante P.N.P.), licenciado Canals, aclaró que la Comisión Estatal estaba obligada a tener preparados los paquetes electorales a más tardar, como fecha límite legal, el 10 de noviembre.

pios de enero de este año, en que comenzó la sesión ordinaria de la Asamblea Legislativa hasta la aprobación de la Ley Núm. 22, *supra*, el 4 de julio, transcurrieron seis (6) meses. En contraste, desde el 4 de julio hasta el domingo 14 de noviembre sólo habrán transcurrido cuatro (4) meses y tres (3) semanas. *Aprisionado así por voluntad legislativa, es obvio que el factor tiempo incidió y anuló cualquier potencial de crear partidos por petición o agrupaciones con definiciones y criterios distintos a los del P.N.P., P.P.D. y P.I.P.*

*No se nos ha señalado una sola razón válida para esta prisa.* En la *Exposición de Motivos* se dice que "[a]l celebrar este año el Quinto Centenario del descubrimiento de nuestra Isla por España, *pesa enormemente en la conciencia* de los puertorriqueños el que tan importante fecha transcurra sin que puedan expresarse en cuanto a su porvenir". Exposición de Motivos de la Ley Núm. 22, *supra*, 1993 Leyes de Puerto Rico 101. Esta retórica expresión no es fundamento suficiente ni justifica la premura. La cuestión, aunque de gran interés público, no revestía carácter de urgencia ni justificaba sofocar la creación de otros partidos o agrupaciones en desacuerdo con su celebración o las definiciones propuestas. *No hay ninguna conexión lógica con el Quinto Centenario del descubrimiento de la Isla —19 de noviembre de 1993— y la celebración festinada del plebiscito cinco (5) días antes. Si hemos aguardado quinientos (500) años, ¿por qué no podemos esperar cinco (5) meses más y reconocer esos derechos? ¿Es que los electores disidentes o desafiliados de los partidos políticos principales no tienen derechos? Como jurista puertorriqueño, rehusamos añadir a nuestra conciencia el peso de semejante arbitrariedad y atropello.*

D. Por último, los reclamos de los electores Sánchez Vilella, Colón Martínez y miembros de la F.U.P.I. son justiciables. La situación ante nos dista mucho de presentarse como *tabú* o *cuestión política*. La controversia real es una *pura de derecho*: interpretar si es constitucionalmente

válida la Ley Núm. 22, *supra*. Ello es función judicial por excelencia.

Acoger la tesis del Estado, de la Comisión Estatal de Elecciones y de los demás demandados representaría obliterar el sistema de separación de poderes. Convertiría a la Asamblea Legislativa y al Ejecutivo en jueces absolutos de sus propios actos. " '¡No corresponde ocuparse, naturalmente, *de aquellos otros que, impresionados por la vibración, diré sonora, de las palabras "cuestiones políticas"*, no penetran el concepto de la "justiciabilidad" y piensan, nada menos, que se pretende "politizar a la justicia" cuando lo que se quiere es *"despolitizar* a las soluciones jurídicas" ...!' " (Énfasis suplido.) L.M. Boffi Boggero, *La función judicial y la abogacía*, 115 Rev. Jur. Arg. La Ley 1095, 1104 (1964).

## II

En lo *sustantivo*, la Ley Núm. 22, *supra*, no resiste el embate constitucional. *La celebración de los referéndum o los plebiscitos sobre el status político no es materia exclusiva ni puede ser objeto de un monopolio definitorio y económico, total y concertado, de los partidos políticos principales.* La existencia de tres (3) fórmulas tradicionales —Independencia, Estado Libre Asociado (E.L.A.) y Estadidad— *no es asunto a congelarse así en la historia.* El *status* del E.L.A. "[p]or su naturaleza, ni excluye ni implica la estadidad federada, la independencia separada *u otra forma de organización política a que nos pued[a] conducir nuestra voluntad y destino".* (Énfasis suplido.) Diario de Sesiones de la Convención Constituyente 2555 (1951).

Al aprobarse la Ley Núm. 22, *supra*, nuestra Ley Electoral clasificaba los partidos políticos en principales y por petición. Se consideraba *principal* al que obtuviera en su insignia en las elecciones precedentes no menos del 7% del total de votos depositados por todas las insignias de parti-

dos, o que obtuviera en papeletas íntegras no menos del 3% del total de papeletas íntegras depositadas por todos los partidos; o cuyo candidato a Gobernador obtuviese en la elección general precedente una cantidad no menor del 5% de votos depositados para todos los candidatos a dicho cargo. 16 L.P.R.A. sec. 3102(42). Como *partidos por petición* se consideraba la agrupación que, con el propósito de figurar en la papeleta electoral de unas elecciones, en o *antes del primero de junio del año de elecciones*, se inscribiera presentando en la Comisión Estatal peticiones juradas suscritas por un número de electores no menor del 5% del total de votos depositados para todos los candidatos al cargo de Gobernador en la elección general precedente, 16 L.P.R.A. sec. 3101(41).

Sin embargo, de un rápido plumazo la Ley Núm. 22, *supra*, descartó todo ese esquema de derechos y concedió la representación, defensa y definición de las tres fórmulas a los partidos políticos *principales* entonces inscritos si notificaban su intención de participar. Sólo el abandono o la rebeldía por alguno permitiría a otras agrupaciones o entidades participar en la representación, definición y defensa de esas fórmulas. Y claro, esa ventaja iba acompañada del uso exclusivo de los cuantiosos fondos públicos. *El impacto real de este esquema preferencial y discriminatorio es que la Ley Núm. 22, supra, concedió a los partidos políticos principales la franquicia para decidir si la ciudadanía puede o no participar en el debate plebiscitario mediante otras organizaciones. De jure* se les negó toda oportunidad.

Aunque los electores Sánchez Vilella, Colón Martínez o los miembros de la F.U.P.I. hubiesen querido intentar inscribir respectivamente un partido por petición, tenían que haberlo hecho para el 1ro de junio de este año, aun cuando la Ley Núm. 22, *supra*, fue firmada el 4 de julio. *La celeridad de los términos, de facto, también les negó toda oportunidad.* En su implantación, la Ley Núm. 22, *supra*, prohíbe de manera absoluta todo acceso a otras agrupacio-

nes distintas a los partidos políticos principales. Estamos, pues, ante un esquema constitucionalmente impermisible a la luz de la razón de decidir (*ratio decidendi*) de *Ortiz Angleró v. Barreto Pérez*, supra. A fin de cuentas, el concepto de inscripción contínua configura dos (2) derechos: como elector individual y grupal, esto es, asociarse para inscribir un partido.

En *P.R.P. v. E.L.A.*, 115 D.P.R. 631, 637–638 (1984), resolvimos que la Asamblea Legislativa no puede legislar contra el axioma de igualdad electoral inmerso *continuamente* en la Constitución.

> El principio igualitario expuesto intenta disuadir que en determinada época un partido, que controla mayoritariamente los poderes ejecutivo o legislativo, o lo comparta con otro —mediante anuencia o consenso— limite el nacimiento de otros partidos. También pretende evitar que se agrave la situación de los partidos de oposición existentes, o introduzca cambios de cualesquiera forma en las leyes y reglas que rigen la contienda electoral en beneficio y ventaja de determinado partido, en perjuicio de aquellos existentes o por inscribirse.
>
> Como principio general aquella legislación que tienda a hacer onerosa y afectar negativa y sustancialmente las potencialidades de los partidos contrarios minoritarios o los *partidos nuevos, o a crear situaciones de inferioridad, puede ser susceptible de impugnación constitucional*. (Énfasis suplido.)

¿Qué justificación hay para un esquema que niega la igualdad de oportunidades electorales y económicas en un proceso político tan importante? ¿Qué interés apremiante existe para suprimir las asociaciones o agrupaciones interesadas en organizarse para participar a favor o en contra de esta consulta?

En resumen, de su faz la Ley Núm. 22, *supra, de jure* discrimina entre los electores afiliados y los no afiliados. No brinda oportunidad alguna a los electores no afiliados a organizar partidos políticos para participar a favor o en contra. *Además, su rápido itinerario de eventos anula todo potencial al efecto; lesiona el derecho al voto, la asociación e igualdad electoral, e injustificadamente inmola el principio*

*igualitario que debe regir en cualquier proceso electoral.* Inyecta en el juego político electoral puertorriqueño unas reglas distintas y más onerosas, disminuyendo el potencial ciudadano a organizarse para colectivamente participar en tan trascendental proceso político.([2])

*La situación es constitucionalmente intolerable.* "Bajo el Art. II, Sec. 2 de nuestra Ley Fundamental, no pueden coexistir dos varas [distintas] para medir la validez de las leyes electorales —una para [el Plebiscito] y otra para elecciones generales— cuando en el fondo las mismas deben consagrar un mismo valor, a saber, el derecho y la oportunidad razonable a ejercer el derecho al sufragio, que constituye la espina dorsal del mecanismo público-político de la ciudadanía en una verdadera democracia." (Escolio omitido.) *Mundo Ríos v. Gobernador*, 121 D.P.R. 416, 418 (1988), opinión disidente.

El *ostracismo* al que la Ley Núm. 22, *supra*, condena a los electores independientes o desafiliados del P.N.P., P.P.D. y P.I.P., incide sobre la validez de los $2,700,000 distribuidos entre ellos. Aunque esa asignación de fondos sea para un evento público, de su faz está ausente el elemento de legalidad.

## III

Para superar estos escollos constitucionales, el Estado argumenta que "[p]ara orientar al pueblo y guiar su crite-

---

([2]) Como dijimos en *P.I.P. v. E.L.A.*, 109 D.P.R. 335, 427 (1980):

"En el contexto constitucional expuesto, el principio igualitario intenta evitar que en determinada época, un partido mayoritario -que controle las Ramas Legislativa y Ejecutiva *se perpetúe en el poder limitando la génesis de otros partidos*, y, además: (a) agrave la situación de los partidos de oposición existentes; y (b) introduzca cambios de cualesquiera forma en las leyes y reglas que rigen la contienda electoral en beneficio y ventaja del partido gubernamental y en perjuicio de los otros. Esta prohibición respecto a aumentar esos requisitos, es susceptible de manifestarse y aplicarse a toda situación que tienda a hacer onerosa y afectar negativa y sustancialmente las *potencialidades de los partidos contrarios minoritarios*. En palabras sencillas, no pueden cambiarse las reglas de juego durante su desarrollo para lograr ventajas." (Énfasis suplido.)

.

rio sobre la fórmula de status, se determinó, lógicamente, que los partidos políticos que han defendido cada alternativa por muchos años son los mejor capacitados para proponer definiciones de esas fórmulas. *Las definiciones no aparecen en la ley ni en la papeleta.* Lo primero asegura que las fórmulas no serán afectadas por una mayoría legislativa que responda a un partido que defienda una fórmula particular, defecto que sufrió el plebiscito celebrado en 1967. Lo segundo asegura que aquellas personas con concepciones diferentes de la fórmula que prefieran puedan votar por ella sin atarse a la definición propuesta por los partidos políticos". (Énfasis suplido.) Alegato en apelación, pág. 21.

En la *misma sintonía*, el Comisionado Electoral del P.N.P., licenciado Canals aduce, en lo pertinente:

> La premisa sobre la cual descansan los apelantes es legal y fácticamente errónea. *El plebiscito es entre fórmulas, no entre las definiciones de los partidos con las cuales los apelantes alegan no estar de acuerdo.*
>
> Primero, la propia Ley dispone que el electorado estará votando por las fórmulas. En ningún sitio dice que se estará votando por las definiciones ofrecidas por los partidos políticos o que pueda tener cualquier otro grupo u organización.
>
> Segundo, cuando la Ley se refiere a las definiciones, lo hace esencialmente *en el contexto de lo dispuesto sobre orientación al elector.* Los demandantes confunden lo que se le está consultando al pueblo. La referencia en la Ley al propósito de las definiciones aparece en el Artículo 8, tocante a los deberes de la C.E.E. de *informar y orientar al elector.*
>
> Surge de la Exposición de Motivos de la Ley Núm. 22, *supra,* que la Asamblea Legislativa autorizó la celebración de un plebiscito de status el 14 de noviembre de 1993 "con el propósito de sentar las bases para la solución del problema del status político de Puerto Rico". El plebiscito, sin embargo, no concluye ese proceso. Más bien, le da inicio. Véase el Informe de la Comisión Conjunta sobre el Plebiscito de Status Político de Puerto Rico referente al P. de la C. 694, 2 de julio de 1993, pág. 22.
>
> Al respecto, la Asamblea Legislativa concluyó que es "imprescindible la celebración de un plebiscito sobre status político que incorpore las tres corrientes ideológicas principales de nuestro desarrollo histórico, a efectuarse en el mes de noviembre de

1993." Exposición de Motivos, Ley Núm. 22, *supra*. Son esas tres ideologías las que aparecen en la papeleta. Por ellas es que votarán los electores.

Por tanto, *las definiciones sometidas por los partidos políticos no son el objeto de esta votación.* Esas definiciones son un marco de referencia que cada partido sometió para dos propósitos: (1) proveer una orientación básica al elector menos sofisticado y menos conocedor del significado de las fórmulas en disputa, y (2) proveer una guía sobre la cual gire el debate previo a la votación. Sin duda, el Estado creó el mecanismo de las definiciones para cumplir con su deber de mantener al elector informado. (Énfasis suplido.) Alegato del Comisionado Electoral Carlos Canals Mora y Oposición a Solicitudes de Apelación, págs. 21–22.

Por su parte, el Comisionado Electoral del P.P.D., licenciado Nazario argumenta que el *"derecho a expresar la inconformidad con las fórmulas o definiciones en este proceso de consulta se canaliza únicamente rechazando la misma y no participando como lo han propuesto los propios demandantes-apelantes.* Si la participación legítima del ciudadano está constitucionalmente condicionada a que una consulta pueda cubrir el universo de las posibilidades en términos de definiciones o fórmulas concebibles, el evento amenazaría peligrosamente con degenerarse en un caos y restaría toda la importancia y efectos posibles que puede tener el resultado de la consulta. Si esa legitimidad está condicionada en el acceso al proceso (*access to ballot*) de cualquiera persona sobre la base de la existencia de un supuesto derecho constitucional a expresar su indefinida inconformidad con la propuesta, daríamos al traste con la naturaleza de los procesos consultivos". (Énfasis suplido.) Alegato de réplica, pág. 8. Y más adelante concluyen que *"[e]llos pueden votar en el plebiscito o ejercer la alternativa democrática de no votar, como en efecto han anunciado públicamente ambos demandantes-apelantes".* (Énfasis suplido.) Íd., pág. 11.

El Comisionado Electoral del P.I.P., licenciado Rodríguez Orellana, con mayor ingeniosa especificación expone que no es necesario la cuarta columna para poder expresar

mediante el voto que no comparten las definiciones propuestas. Nos dice:

En el supuesto de que en efecto quisieran votar y no abstenerse, como han anunciado públicamente y han admitido bajo juramento ante la sala sentenciadora, podrían muy bien *votar en blanco*, o *votar anulando* su papeleta como señal de protesta, indicativa de que prefieren alguna fórmula o definición distinta. Incluso, podrían desarrollar, si quisieran, una campaña para invitar a otros electores a hacer lo mismo, de suerte que resultara en un hecho político significativo que determinado número de electores hubiese expresado su inconformidad con el proceso o con las fórmulas o definiciones propuestas. En otras palabras, nada en la Ley de Plebiscito impide la expresión de los demandantes mediante el ejercicio del voto en estas formas.

De otro lado, la *impracticabilidad* de incluir una columna de nominación directa en este tipo de votación resulta evidente. En una elección general tiene sentido porque es muy fácil identificar con un nombre a la persona por la que uno quiere votar. Ello resulta en un resultado concreto, fácilmente *contabilizable*. Pero cuando se trata de fórmulas políticas, la situación es muy diferente. Sería imposible interpretar, o resultaría políticamente insustancial, que determinado número de personas que simpatizan con la estadidad, pero que no comparten la definición propuesta por el Partido Nuevo Progresista, votaran por diversas formas como podrían ser "estadidad jíbara", o "estadidad de verdad" "o estadidad como los demás estados", o "estadidad al pelo", o "estadidad sin comité olímpico, que no es importante". Sería igualmente imposible de interpretar que apareciera determinado número de votos a favor de "ELA culminado", o "autonomía", o "libre asociación", o "república asociada". Tampoco sería posible interpretar los votos emitidos a favor de "soberanía plena", o "república", o "república independiente", o "independencia sin bases militares ni ayudas federales". *Lo único que le podría dar sentido a estos votos* sería su contabilización dentro de una de las tres fórmulas tradicionales que aparecen en la papeleta. Su contabilización separada sería políticamente insustancial. Por último, tampoco sería significativo en el proceso de libre determinación del Pueblo de Puerto Rico que un número de electores votara por "la monarquía", o "el principado", o "la dictadura del proletariado", o "democracia griega", o "democracia popular", etc., etc., etc. En consecuencia, lo que solicitan los demandantes mediante la pretensión de una cuarta columna ordenada por este Honorable Tribunal, es que el poder judicial se inmiscuya en una cuestión

política, como ya se ha demostrado anteriormente, sin que el resultado concreto del remedio que se pudiese emitir *tuviese significación alguna sobre el ejercicio del Pueblo de Puerto Rico a su libre determinación.* Sería una protección puramente formal de un derecho al voto sin consecuencia política alguna. *[Sería un] ejercicio del Derecho del Absurdo* (Énfasis suplido.) Alegato del Codemandado Apelado Comisionado Electoral del Partido Independentista Puertorriqueño, págs. 29–30.(³)

De entrada aclaramos el prisma judicial pertinente: *la preeminencia del derecho al sufragio.* En nuestro país, incuestionablemente existe un " '*mandato* insoslayable en la Carta de Derechos[, Art. II, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1] imponiéndole la obligación [a la Asamblea Legislativa] de *garantizar* —palabra clave— la *pureza* del sistema electoral. Proviene de "garante", esto es, que da garantía, asegurando y protegiendo algo contra algún riesgo o necesidad.' (Énfasis en el original.) *P.S.P., P.P.D., P.I.P. v. Romero Barceló,* supra, 294–295". (Escolio omitido.) *Gierbolini Rodríguez v. Gobernador,* supra, pág. 413, opinión disidente.

*Es inaceptable la tesis de que las definiciones, por haber sido adoptadas por los partidos políticos y no aparecer en la papeleta, no forman parte del plebiscito. La realidad es otra.* La Asamblea Legislativa no sólo delegó en los partidos principales su definición, sino que diseñó unos mecanismos que para todos los fines prácticos realmente las oficializó. De lo contrario, ¿cómo justificar que la Legislatura le haya impuesto a la Comisión Estatal la obligación de ser la *portavoz oficial* de una intensa campaña de información y orientación al elector puertorriqueño sobre "el contenido de las definiciones que para cada una de las fórmulas de status hubieren propuesto los partidos políticos o grupos que participen en el Plebiscito en representación de las diversas fórmulas"? ¿Cómo explicar el mandato legisla-

---

(³) El licenciado Báez Galib como *amicus curiae* indica que la Ley Núm. 22 no es un plebiscito pues "[n]o contiene los elementos esenciales para *constituir* un *ejercicio* de la autodeterminación contemplado por nuestro estado de derecho doméstico según dictado por el internacional".

tivo de que "esta campaña *reproducirá textualmente*" en *todos* los *medios* de comunicación a su alcance "el *texto* de las definiciones de las tres fórmulas de status que se someterán a votación"? Más aún, ¿qué razón existe para la reproducción masiva en "hojas sueltas" del texto de esas definiciones, "para ser entregadas a los electores junto con la papeleta"? ¿Qué otra explicación y alcance tiene la inversión millonaria y campaña plebiscitaria masiva? ¿Vamos a ignorar esa campaña? ¿Podemos cerrar los ojos ante la propaganda y debates de los partidos políticos costeada con fondos públicos sobre las virtudes, verdades y falsedades de *cada una de esas definiciones?* Unimos como Apéndices A, B y C, respectivamente, facsímil de los anuncios oficiales de la Comisión Estatal de Elecciones que han aparecido recientemente en la prensa que demuestran cómo se le presenta al elector, ¡para orientarlo!, la estrecha relación entre las fórmulas y los símbolos de *status y* las definiciones, copia de la "hoja suelta" y de la papeleta.

*Estas circunstancias son modeladoras de la solución jurídica. En recta apreciación, aceptar la interpretación de que las definiciones no forman parte del plebiscito y votación equivale a sostener que el Estado —Asamblea Legislativa y Primer Ejecutivo— con los auspicios y colaboración directa de los tres (3) partidos principales —P.N.P., P.P.D. y P.I.P.— han perpetrado una gran farsa y costosísima mentira.*

Es absurdo pretender decirle al pueblo y a los electores que voten por la fórmula de su predilección, haciendo caso omiso a esas definiciones "oficiales". *Esta verdad social y jurídica es innegable.* ¿Vamos a ser tan ingenuos como para pensar que al momento del elector entrar en la caseta electoral con su papeleta *y* hoja suelta con las definiciones las olvidará? *En este extremo, la Ley Núm. 22, supra, parece tener más de máscara que de rostro. La dinámica electoral resultante, el verdadero corpus del Plebiscito son las fórmulas y definiciones.* Repetimos, pretender que el electorado,

al entrar a la caseta con la papeleta y la hoja suelta que contienen tales definiciones, no las tome en cuenta al votar *es un mito. La velocidad del trámite electoral pautado y la conducción de una campaña oficial y monopolizante por los tres (3) partidos políticos han sido avasalladoras.*

### IV

Una vez concluido que las definiciones forman parte integral e inseparable de la votación, es un imperativo decisorio diseñar un mecanismo que permita a cualquier elector, incluso a los apelantes Sánchez Vilella, Colón Martínez y miembros de la F.U.P.I., como electores desafiliados, la alternativa de hacer constar sus criterios distintos. *Ello nos lleva a la necesidad de explorar el remedio de la cuarta columna o su equivalente funcional.*

El concepto "sufragio universal" implica "igualdad de todos los seres humanos y una confianza y efectos en sus decisiones [c]onlleva 'un llamamiento a todos los ciudadanos, porque se cree que entonces se operarán espontánea y democráticamente una selección que saque a flote a los ... más idóneos' ". *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 D.P.R. 248, 297 (1980), opinión concurrente y disidente. Se funda en el respeto al derecho a diferir y a ser "tratado con *igualdad* ... por el poder público", como una de las virtudes en una democracia liberal —Diario de Sesiones, *supra*, pág. 2562— y que el Art. II, Sec. 2 de nuestra Constitución, L.P.R.A., Tomo 1, ed.1982, pág. 261, prístinamente dispone que "[l]as leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano *contra toda coacción en el ejercicio de la prerrogativa electoral"*. (Énfasis suplido.)

Una mirada retrospectiva al debate en la Asamblea Constituyente en torno a una propuesta para que el Art. II, Sec. 2, Const. E.L.A., *supra*, consignara también que el "voto era obligatorio", *es suficiente fuente para apoyar la*

*cuarta columna o su equivalente funcional en este Plebiscito, sin que sea menester acudir a la jurisdicción federal.* Veamos.

De las distintas manifestaciones de los delegados de la mayoría que derrotaron esa proposición surgen las premisas y conclusiones siguientes: *primero*, para fines del voto, existe "una diferencia entre obligación y obligatorio" ((Rivera Colón) Diario de Sesiones, *supra*, pág. 1390); *segundo*, hacerlo obligatorio "constituir[ía] un ingrediente de compulsión y de exigencia" de dudosa conveniencia incorporarlo en la Constitución ((Benítez, J.) íd., pág. 1391); *tercero*, "[e]n una elección no hay siempre dos controversias nada más. En una elección puede haber *cuarenta posibilidades de controversia* y sin embargo, sometérsele al pueblo *solamente dos de esas cuarenta*. Y estamos *obligando a la persona a expresar su criterio sobre solamente dos...*" —énfasis suplido— ((Fernández Méndez) íd., págs. 1409–1410); *cuarto*, el "derecho al voto conlleva el *derecho a abstenerse de votar* cuando no se cree en las controversias que el Estado le plantea al individuo..." —énfasis suplido— (Íd.); *quinto*, el "camino de la democracia no es la fuerza. La fuerza es el totalitarismo. Y [obligar al elector] es una medida totalitaria, el Estado empujando al hombre a hacer lo que el Estado representado *por los hombres que en el momento opinan, cree que es lo mejor que el pueblo debe hacer o no hacer*" (énfasis suplido) Íd.; *sexto*, la "democracia no es la imposición del derecho a actuar como ciudadano libremente, sino la educación del individuo por el Estado para que los individuos todos creen el mejor tipo de gobierno que ellos puedan hacer; y *eso conlleva, entre otros derechos*: el derecho a no votar por nadie o *a votar por algo que es distinto a lo que está en controversia pero que por el mecanismo electoral o político no lo ha puesto el Estado en la elección para que el pueblo pueda opinar sobre eso*; [el] que el individuo tenga el derecho a permanecer en su hogar y no expresar su criterio sino en su hogar o en la tribuna

pero sin tener que ir a votar". (Énfasis suplido.) Íd.; *séptimo, la abstención electoral "es una forma de [manifestación] contra* ... lo que se está haciendo en Puerto Rico en es[e] momento" ((Rivera Reyes) íd., pág. 1424); *octavo*, de hacerse obligatorio, el "ciudadano habrá de resentir la compulsión del Estado sobre él. Eso es lo fundamental. Habrá de venir a considerar sus derechos políticos, no como un privilegio que son, sino como una odiosa carga. El voto que se habrá de emitir, si no es *para hacer énfasis en su resentimiento, para dejar la papeleta en blanco, [no] habrá de reflejar nada, sino su falta de interés o su falta de conocimiento"* —énfasis suplido— ((Fernández Méndez) íd., pág. 1435), y *noveno*, colocar en la Carta de Derechos que es obligatorio el voto, es un contrasentido que atenta contra la libertad individual ((Benítez, J.) íd., pág. 1445).

Estos pronunciamientos de los forjadores de nuestra Constitución son *trascendentales. Nos permiten redescubrir una dimensión dormida en torno al verdadero significado de que el voto no es obligatorio.* Se trata de una cualidad de amplio *spectrum*, susceptible de distintas manifestaciones en una democracia madura. Nos explicamos.

Indudablemente, en un caso como el de autos, en que el Estado ha cerrado las urnas al elector no afiliado o al que desea protestar las definiciones, prohibiendo que escriba en la papeleta su voluntad, lo está directamente *obligando* a adoptar una de las posturas siguientes: votar a favor de una de las tres (3) fórmulas y definiciones, mutilar la papeleta, votar en blanco, o abstenerse. Francamente, para el elector que no está de acuerdo con las definiciones, la primera opción es *absurda* y ninguna de las otras alternativas es adecuada, pues por no contabilizarse le niega toda eficacia jurídica y valor a su voto.

La ausencia de una cuarta columna, encasillado o equivalente en que el elector pueda expresar su insatisfacción a

las tres (3) fórmulas propuestas por los partidos políticos, es un método demasiado drástico que no se justifica. El interés adelantado por el Estado de evitar diluir los votos, en el fondo conlleva proteger a los tres (3) partidos políticos y sus definiciones contra toda competencia. *Ni el tiempo ni el dinero invertido lo justifican.* Se trata de una restricción en la papeleta que atenta contra el debate político y el mercado de libres ideas. Derrota el valor del voto como modo de expresar una posición distinta a las definiciones o una protesta política. Obliga y promueve a la abstención, práctica mortal para la mejor salud democrática de un pueblo. *Compele* al elector a quedarse en su casa, o a depositar la papeleta en blanco, o a mutilarla, alternativas todas que atentan contra su dignidad y derecho de expresión. *Dejar de votar no es equivalente a una expresión afirmativa de disentir en la papeleta. A fin de cuentas, votar es una forma de expresión (hablar) que sólo puede oírse si el Estado cuenta el voto, lo informa y certifica como parte del escrutinio oficial.*

Si no se le da la oportunidad al elector de exponer así su criterio, predilección, e incluso protesta, el derecho al voto se convierte en vana ilusión, algo hueco, carente de sentido ético y social. *Precisamente, por ser el voto un derecho sagrado, para que sea eficaz y tenga algún sentido jurídico tiene que contarse.*

La Ley Núm. 22, *supra*, confisca el libre albedrío del elector al dar un monopolio a los tres (3) partidos principales, ha condenado *a priori* a aquellos estadistas, autonomistas e independentistas que no están de acuerdo con el catálogo de definiciones o virtudes de cada fórmula. Le da la espalda a una realidad puertorriqueña e ignora que, como consecuencia del pluralismo político, unas mismas corrientes ideológicas tienen diversas expresiones partidistas. Sin el derecho a poder escribir su propia selección, los ciudadanos que no coinciden con la política popular no tienen otra alternativa que seguir ciegamente a los

partidos políticos con los cuales discrepan o abstenerse de votar. K.A. Craddock, *Write–In Voting*, 22 (Núm. 1) Cumb. L. Rev. 311 (1992).

La ausencia de esa oportunidad es constitucionalmente impermisible y "atenta al corazón del sistema representativo". (Traducción nuestra.) *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). "Tales restricciones son un peso sobre el derecho de asociación para adelantar ideas políticas y cierra la oportunidad de expresar su insatisfacción con los candidatos que aparecen en la papeleta. La nominación directa abre y da acceso a las urnas a candidatos de terceros partidos que ofrecen teorías políticas competitivas, dan a los electores una oportunidad para expresar su apoyo a esas teorías y agudizan el debate político." (Traducción nuestra.) D.L. Permut & J.P. Verdon, *Protecting the American Tradition of Write–In Voting after Burdick v. Takushi*, 9 (Núm. 2) The Journal of Law & Politics 196 (1992).

El Estado ni los demás demandados apelados pueden descansar en *Burdick v. Takushi*, 504 U.S. 428 (1992), caso de una *simple candidatura*. Allí el Tribunal Supremo federal sostuvo que la prohibición en la papeleta a nominación directa (*write-in*) no infringía los derechos ciudadanos consagrados en la Primera y Decimocuarta Enmiendas, *siempre que el Estado brindara una previa y razonable oportunidad en primarias para la nominación.*

Esa decisión, muy severamente criticada por abandonar la trayectoria liberal de casos que viabilizaban el acceso a la papeleta —M. Logan, Nota: *The Right to Write–In: Voting Rights and the First Ammendment*, 44 (Núm. 3) Hastings L.J. 727 (1993); Permut & Verdon, *supra*; Craddock, *supra*— *es inaplicable.*

*En Puerto Rico el análisis judicial sobre el derecho al sufragio se rige por el Art. II, Sec. 2 de nuestra Constitución, supra. Según surge del debate y el espíritu de la Asamblea Constituyente antes expuesto, es ineludible con-*

*cluir que la Legislatura no está en libertad ni puede pres-cindir del mecanismo de nominación directa* (write-in), *pues es el único remedio de evitar "toda coacción en el ejercicio de la prerrogativa electoral". Así lo proveen nuestras leyes electorales. Y distinto, sabemos que la Ley Núm. 22, supra, no brindó a los electores la más mínima oportunidad de poder participar fuera de líneas definitorias partidistas.*

*Finalmente, sobre este punto, ¿puede seriamente invocarse y compararse un caso de candidatura de Hawaii con un plebiscito sobre el destino de nuestro pueblo?*

## V

*Los fundamentos expuestos justifican plenamente que se declare inconstitucional la Ley Núm. 22,* supra, *e inmediatamente se paralice su celebración. Así lo favorecemos.* Aunque drástico, es el *único remedio* que de manera *completa* vindicaría los derechos electorales de los apelantes Sánchez Vilella, Colón Martínez y miembros de la F.U.P.I.

Ahora bien, conscientes de que sería un remedio extremo, al igual que otros miembros del Tribunal hemos explorado alternativas de menor impacto que les permita dignamente superar la encerrona de la abstención. Con los antecedentes de este caso es altamente cuestionable legitimar los resultados de este Plebiscito, atribuyéndole iguales proporciones entre los electores que votaron y los que se abstuvieron. Tampoco predicar que el "poder público es definitivo, está en el pueblo, y el pueblo lo ejerce a través del voto y quien renuncia el derecho al voto está *ipso facto* dejando su autoridad en manos de aquéllos que lo ejercen. Por consiguiente, los que van a votar son los jueces, y la mayoría de ellos es la que debe decidir ... cualquier cosa. El argumento de que el que dejó de votar estaba en contra, es falso". Fernós Isern, Diario de Sesiones, *supra*, pág. 2049. Existen poderosas razones:

*...Primero*, aquéllos que depositaron sus votos pueden ser representativos de los que se quedaron en sus casas. Sin embargo, *no está claro que los votantes abstenidos puedan dividirse en la misma proporción que los que votaron...* Una segunda respuesta puede ser la del *impedimento*. Tal y como proclamaba un anuncio de campaña preelectoral "Vota y la decisión es tuya. No votes y la decisión es de ellos". En efecto, se considera que los que decidieron quedarse en sus casas dieron sus poderes ('proxies') a los que fueron a votar. Sin embargo, el valor persuasivo de ese argumento disminuye *si en el proceso eregimos obstáculos que hagan inaccesibles las papeletas a ciertos grupos.* (Énfasis suplido y traducción nuestra.) J.N. Fule, *Judicial Review of Direct Democracy*, 99 (Núm. 7) Yale L.J. 1515 (1990).

*Sin normas precisas, resulta difícil interpretar el voto en blanco como un desinterés en el fondo, de protesta, o contrario a las definiciones. De subsistir esta laguna, ni el Poder Ejecutivo ni el Legislativo podrían tener una idea clara del resultado del Plebiscito; menos sus destinatarios, el Presidente y el Congreso de Estados Unidos (Art. 27 de la Ley Núm. 22 de 4 de julio de 1993, Leyes de Puerto Rico 112).*

No estamos ajenos a que las 3,072,000 papeletas ya fueron impresas y están dentro de los 7,300 paquetes listos en espera de ser distribuidos por la Comisión Estatal de Elecciones. Reconocemos también las dificultades prácticas que conllevará contabilizar las distintas variaciones que potencialmente existen para cada *fórmula* de *status*. También, que el propósito de pulsar las preferencias tradicionales es un interés apremiante. Ninguno de estos reparos impide reconocer en la papeleta, como votos válidos a ser contabilizados, la expresión escrita de protesta o cualificación en el espacio, incluso que se cuenten las que dispongan "NINGUNA". *En otras palabras, como primer remedio alterno al decreto de inconstitucionalidad, favorecemos permitir a los electores escribir su voluntad en la papeleta, sin que ello la anule y, naturalmente, que se cuente.*

Insistimos, los electores Sánchez Vilella, Colón Martínez y miembros de la F.U.P.I. tienen perfecto derecho a comparecer a votar expresamente contra las definiciones y

que se les contabilice sus votos. *A priori, no podemos tachar de insustancial o sin consecuencia esos votos. No importa que el resultado del escrutinio no les favorezca, tienen ese derecho. Obligarlos al retraimiento o abstención electoral, a mutilar la papeleta o depositarla en blanco en la urna —sin ningún significado jurídico— no sólo infringe sus derechos de libre expresión, asociación y sufragio, sino que representa un burdo atentado contra su dignidad de seres humanos.*

En esta *primera alternativa*, el resultado concreto sería fácilmente cuantificable con unas simples reglas. Las encontramos inmersas en el propio argumento del Comisionado Electoral del P.I.P., licenciado Rodríguez Orellana, antes reproducido. Parafraseándolo, se podría precisar el "número de personas que simpatizan con la estadidad, pero que no comparten la definición propuesta por el Partido Nuevo Progresista, [que] votar[o]n por diversas formas como podrían ser 'estadidad jíbara', o 'estadidad de verdad' o 'estadidad como los demás estados', o 'estadidad al pelo', o 'estadidad sin comité olímpico, que no es importante'. Sería igualmente [p]osible de interpretar que apareciera determinado número de votos a favor de 'ELA culminado', o 'autonomía', o 'libre asociación', o 'república asociada'. Tam[bién] sería posible interpretar los votos emitidos a favor de 'soberanía plena', o 'república independiente', o 'independencia sin bases militares ni ayudas federales'. Por último, tam[bién] *sería [cuantificable el]* número de electores [si] votar[on] por 'la monarquía', o 'el principado', o 'la dictadura del proletariado', o 'democracia griega', o 'democracia popular', etc., etc., etc."

Según este enfoque, las papeletas marcadas únicamente bajo el símbolo correspondiente a la fórmula, sin ningún tipo de expresión a las expuestas o análogas, serían votos a computarse como *endosando la fórmula de status más las definiciones*. Sin embargo, los cualificados serían votos a favor del *status pero condicionado*, esto es, *sin endosar las*

*definiciones.* Y aquellas no susceptibles de precisarse a favor de quién, *como un voto de protesta a todo el esquema de la Ley Núm. 22,* supra.

Como *segunda alternativa* remedial —también resultado de la vista oral— endosamos la solución que allí propusiéramos a los efectos de que se establezca la norma jurídica de que toda papeleta depositada en blanco será considerada *un voto de protesta contra las definiciones partidistas,* siempre y cuando ese mandato vaya acompañado de una orden a la Comisión Estatal de Elecciones para que inmediatamente desarrolle una campaña informativa y de orientación efectiva al elector sobre esta alternativa.

En la medida en que así lo dispone la mayoría del Tribunal, en aras de evitar dejar en la total orfandad a los electores Sánchez Vilella, Colón Martínez y miembros de la F.U.P.I., por su equivalencia funcional, *concurrimos.*

## VI

Recapitulando, "[e]n principio, constitucionalmente hablando, no hay —ni puede haber— reparo a consultas o referéndum en que se le someta al electorado asuntos relativos al presente y futuro *status* político. Tampoco puede haber obstáculos a elevar a la Constitución sus anhelos de pueblo y otros derechos concretos. Aquí el problema es otro: "[la Ley Núm. 22] infring[e] la Sec. 2 del Art. II de la Constitución y dist[a] mucho de cumplir el propósito cardinal de toda elección o consulta electoral, a saber, 'obtener la expresión de la voluntad de los votantes que constituyen el cuerpo electoral de un país'. *La Nueva Constitución de Puerto Rico,* Escuela de Administración Pública, Ed. U.P.R.1954, pág. 307. Y es que el mandato de 'garantizar' el sufragio electoral impide referéndum *discriminatorios* pues se proyecta sobre la Asamblea Legislativa en una dimensión sobreentendida: *la buena fe,* que 'como principio

general del derecho, a través de la interpretación e integración de las normas, haciendo que el derecho, no se maneje de espaldas a su fundamento ético, sino como un factor informante y espiritualizador'. O. Alfredo Gozaini, *La buena fe en el proceso*, 1986–D Rev. Jur. Arg. La Ley 877–886 (1986)". (Énfasis suplido y en el original.) *Gierbolini Rodríguez v. Gobernador*, supra, págs. 413–414, voto disidente.

"En nuestro sistema de adjudicación aspiramos siempre a una mayor aproximación al ideal de la verdad y de la justicia; con más vehemencia en la aplicación de la Ley Electoral de Puerto Rico y en la axiología neutral que la apuntala. De esa forma evitamos que los principios rectores que la inspiran se conviertan, al decir de Natalio Botana, en 'máscaras o espejos deformantes: [que] esconden cosas y condicionan la representación política' ." *Calcador Berríos v. Ramírez Pantojas*, 121 D.P.R. 491, 492 (1988), voto disidente.

El interés público que reviste en todas sus etapas una consulta electoral de este género, lejos de hacer inaplicable la doctrina sobre designación directa (*write-in*) —consistente aquí de una cuarta columna *o su equivalencia funcional— reclama su más estricta aplicación como único mecanismo para no subvertir la razón lícita en que se funda el derecho libre al voto en una verdadera democracia.* Negarla a base de que las definiciones de los tres (3) partidos políticos principales (P.N.P., P.P.D. y P.I.P.) no forman parte del plebiscito, implica que desde un inicio ha existido una trama gubernamental urdida para defraudar y confundir a los electores que, por su propia e inherente condición, es un vicio de índole moral que constitucionalmente el Poder Judicial no puede convalidar y dar por bueno. *En sus entrañas lleva el vicio del engaño y desde su génesis está herido de muerte. Repetimos, toda consulta electoral es en sí un*

*pacto de la más alta categoría en el orden jurídico y social
del derecho público.*

Por los fundamentos expuestos, *disentimos. No deberí-
amos judicialmente refrendar un plebiscito que niega ac-
ceso a las urnas a sectores y a voces importantes del país,
que desvirtúa el propósito de su celebración e inmola la
verdadera esencia del voto libre como instrumento de utili-
dad en una sociedad democrática.*

Sin embargo, aun cuando nos parece trunco e incom-
pleto, concurrimos con el dictamen mayoritario que ordena
a la Comisión Estatal de Elecciones *adjudicar la papeleta
depositada en blanco como un voto de protesta contra las
definiciones partidistas,* unido a una inmediata campaña
educativa. *Aunque imperfecto, frente a la alternativa de
ningún remedio judicial, representa un mecanismo de ex-
presión electoral mínimo para las minorías y las voces
disidentes.*

# APÉNDICE A

EL NUEVO DIA LUNES 1 DE NOVIEMBRE DE 1992

## Estas son las definiciones de las fórmulas de Status Político de acuerdo a los partidos que las promulgan.

### ESTADIDAD

Un voto por la Estadidad es un mandato para reclamar el ingreso de Puerto Rico como Estado de la Unión.

**La Estadidad:**

* Es un status no colonial de plena dignidad política

* Nos permitirá tener los mismos derechos, beneficios y responsabilidades de los cincuenta Estados.

* Es la unión permanente garantizada y la oportunidad de progreso económico y político.

* Esta garantía permanente de todos los derechos que da la Constitución de los Estados Unidos de América - incluyendo la preservación de nuestra cultura.

* Es la garantía permanente de la ciudadanía americana, nuestros dos idiomas, himnos y banderas.

* Es la participación completa en todos los programas federales.

* Es el derecho de votar por el Presidente de los Estados Unidos y elegir no menos de seis representantes y dos senadores puertorriqueños al Congreso

* En el ejercicio de nuestros derechos como ciudadanos americanos, negociaremos los términos de dicha admisión, los cuales se someterán al pueblo de Puerto Rico para su ratificación

### ESTADO LIBRE ASOCIADO

Un voto por el Estado Libre Asociado es un mandato a favor de:

* Garantizar el progreso y la seguridad nuestra y de nuestros hijos dentro de un status de plena dignidad política, basado en la unión permanente entre Puerto Rico y los Estados Unidos, consagrada en un pacto bilateral que no podrá ser alterado sino por mutuo consentimiento.

**El Estado Libre Asociado garantiza:**

* Ciudadanía americana irrevocable;
* Mercado común, moneda común y defensa común con los Estados Unidos;
* Autonomía fiscal para Puerto Rico;
* Comité Olímpico puertorriqueño y representación deportiva internacional propia;
* Pleno desarrollo de nuestra identidad cultural; con el ELA somos puertorriqueños primero.

**Desarrollaremos el Estado Libre Asociado mediante planteamientos específicos al Congreso. De inmediato propondremos:**

* Reformular la sección 936, asegurando la creación de más y mejores empleos,
* Extender el Seguro Social Complementario (SSI) a Puerto Rico;
* Obtener asignaciones del PAN iguales a las de los estados;
* Proteger otros productos de nuestra agricultura, además del café.

Todo cambio adicional se someterá previamente a la aprobación del pueblo de Puerto Rico.

### INDEPENDENCIA

La independencia es el derecho de nuestro pueblo a mandarse en su propia tierra; es el disfrute de todos los poderes y atributos de la soberanía.

En el ejercicio de ese derecho inalienable e irrenunciable, Puerto Rico se regirá por una Constitución que establezca un gobierno democrático, proteja los derechos humanos y afirme nuestra nacionalidad e idioma.

La independencia dará a Puerto Rico los poderes que son necesarios para lograr mayor desarrollo y prosperidad, incluyendo los poderes para proteger y estimular nuestra industria, agricultura y comercio, controlar la inmigración y negociar acuerdos internacionales que amplíen mercados y promuevan inversiones de otros países.

Un Tratado de Amistad y Cooperación con Estados Unidos y un proceso de transición a la independencia acordes con la legislación ya aprobada por la Cámara y los comités competentes del Senado federal dispondrán para. la continuación de beneficios adquiridos de Seguro Social, veteranos y otros, la ciudadanía puertorriqueña y la de Estados Unidos para quienes deseen conservarla; el derecho a usar moneda propia o el dólar; acceso libre al mercado de Estados Unidos; incentivos contributivos para la inversión norteamericana; aportaciones federales por igual cantidad que al presente durante al menos una década; y la eventual desmilitarización del país.

## ¡Infórmate bien y vota en el Plebiscito del 14 de noviembre!

COMISION ESTATAL DE ELECCIONES

# APÉNDICE B

Estimado Elector:

Este folleto incluye las definiciones de cada fórmula de status político según las han propuesto los partidos políticos principales de Puerto Rico, con sus correspondientes símbolos.

**SU VOTO ES IMPORTANTE**

**VOTE EL**
**14 DE NOVIEMBRE DE 1993**

Juan R. Melecio
Presidente

Carlos Canals Mora
Comisionado PNP

José Ariel Nazario
Comisionado PPD

Manuel Rodríguez Orellana
Comisionado:

**ESTADIDAD** | **ESTADO LIBRE ASOCIADO** | **INDEPENDENCIA**

**PLEBISCITO**
SOBRE EL STATUS POLITICO
de *Puerto Rico*
14 de noviembre de 1993

**DEFINICION**
*de las*
**FORMULAS**

O Estadidad
□ Estado Libre Asociado
△ Independencia

COMISION ESTATAL DE ELECCIONES
San Juan, Puerto Rico

## DEFINICION DE INDEPENDENCIA

La Independencia es el derecho de nuestro pueblo a mandarse en su propia tierra; es el disfrute de todos los poderes y atributos de la soberanía.

En el ejercicio de ese derecho inalienable e irrenunciable, Puerto Rico se regirá por una Constitución que establezca un gobierno democrático, proteja los derechos humanos y afirme nuestra nacionalidad e idioma.

La Independencia dará a Puerto Rico los poderes que son necesarios para lograr mayor desarrollo y prosperidad, incluyendo los poderes para proteger y estimular nuestra industria, agricultura y comercio, controlar la inmigración y negociar acuerdos internacionales que amplíen mercados y promuevan inversiones de otros países.

Un Tratado de Amistad y Cooperación con Estados Unidos y un proceso de transición a la Independencia acordes con la legislación ya aprobada por la Cámara y los comités competentes del Senado federal dispondrán para: la continuación de beneficios adquiridos de Seguro Social, veteranos y otros; la ciudadanía puertorriqueña y la de Estados Unidos para quienes deseen conservarla; el derecho a usar moneda propia o el dólar; acceso libre al mercado de Estados Unidos; incentivos contributivos para la inversión norteamericana; aportaciones federales por igual cantidad que al presente durante al menos una década; y la eventual desmilitarización del país.

## DEFINICION DEL ESTADO LIBRE ASOCIADO

Un voto por el Estado Libre Asociado es un mandato a favor de:

* Garantizar el progreso y la seguridad nuestra y de nuestros hijos dentro de un status de plena dignidad política, basado en la unión permanente entre Puerto Rico y los Estados Unidos, consagrada en un pacto bilateral que no podrá ser alterado sino por mutuo consentimiento.

El Estado Libre Asociado garantiza:

* Ciudadanía americana irrevocable;
* Mercado común, moneda común y defensa común con los Estados Unidos;
* Autonomía fiscal para Puerto Rico;
* Comité Olímpico puertorriqueño y representación deportiva internacional propia;
* Pleno desarrollo de nuestra identidad cultural: con el ELA somos puertorriqueños primero.

Desarrollaremos el Estado Libre Asociado mediante planteamientos específicos al Congreso. De inmediato propondremos:

* Reformular la sección 936, asegurando la creación de más y mejores empleos;
* Extender el Seguro Social Complementario (SSI) a Puerto Rico;
* Obtener asignaciones del PAN iguales a las de los estados;
* Proteger otros productos de nuestra agricultura, además del café.

Todo cambio adicional se someterá previamente a la aprobación del pueblo de Puerto Rico.

## DEFINICION DE ESTADIDAD

* Un voto por la Estadidad es un mandato para reclamar el ingreso de Puerto Rico como Estado de la Unión.

La Estadidad:

* Es un status no colonial de plena dignidad política.
* Nos permitirá tener los mismos derechos, beneficios y responsabilidades de los cincuenta estados.
* Es la unión permanente garantizada y la oportunidad de progreso económico y político.
* Es la garantía permanente de todos los derechos que da la Constitución de los Estados Unidos de América –incluyendo la preservación de nuestra cultura.
* Es la garantía permanente de la ciudadanía americana, nuestros dos idiomas, himnos y banderas.
* Es la participación completa en todos los programas federales.
* Es el derecho de votar por el Presidente de los Estados Unidos y elegir no menos de seis representantes y dos senadores puertorriqueños al Congreso.
* En el ejercicio de nuestros derechos como ciudadanos americanos, negociaremos los términos de dicha admisión, los cuales se someterán al Pueblo de Puerto Rico para su ratificación.

NOTA DE LA COMPILADORA:

El modelo que contiene esta página constituye el reverso del modelo original del Apéndice B.

APÉNDICE C

Voto disidente preliminar emitido por el Juez Asociado Señor Rebollo López.

*Disentimos*. No podemos menos que hacer constar en este momento *nuestro asombro* ante la errónea y contradictoria decisión mayoritaria emitida en el día de hoy en el presente caso.

La misma no sólo pone en entredicho, *una vez más*, la reputación de este Tribunal, sino que pone en tela de juicio la capacidad de este Foro para resolver, *con corrección*, las controversias jurídicas que ante el mismo se dilucidan. La acción mayoritaria —ordenándole a la Comisión Estatal de Elecciones que "adjudique las papeletas que se depositen en blanco como un voto que no favorece ninguna de las definiciones de *status* propuestas por los partidos"— *es una que carece de todo sentido jurídico o lógico*. (Énfasis en el original.) Opinión mayoritaria, págs. 450–451.

En primer lugar, *y en cuanto al "remedio" concedido por el Tribunal*, el mismo es uno que no fue solicitado por los demandantes apelantes, *ello por razones obvias*: de adolecer la Ley en controversia de validez constitucional —*lo que rechazamos*— el remedio concedido hoy por el Tribunal no "cura" la alegada inconstitucionalidad de la misma. En segundo término, dicho remedio puede dar lugar a la comisión de un fraude masivo en la votación a ser celebrada el 14 de noviembre de 1993. En tercer lugar, la adjudicación de dicha papeleta en blanco como un voto de protesta afecta seriamente, o diluye, el efecto y consecuencia de los votos que se emitan a favor de cualesquiera de las tres (3) fórmulas de *status* que históricamente se han reconocido en Puerto Rico. Por último, al Tribunal ordenar que la papeleta en blanco se cuente como un voto de inconformidad contra esas tres (3) fórmulas, está invadiendo no sólo la función reservada por nuestra Constitución a la Asamblea Legislativa sino que inconcebiblemente pretende entrar en la psiquis de los electores que así emitan su voto y haciendo uso de una "bola de cristal o mágica" adivina, y ad-

judica por adelantado, la intención y propósito de toda una gama de electores que pueden votar en blanco el próximo 14 de noviembre de 1993 por razones totalmente ajenas a un voto de protesta.

En cuanto *a la "procedencia" del recurso* hoy ante nuestra consideración, basta con decir —*por ahora*— que el mismo plantea una controversia no justiciable, ello en vista de que la parte promovente carece de legitimación activa para impugnar la constitucionalidad de la Ley Núm. 22 de 4 de julio de 1993, Leyes de Puerto Rico 101, y de que dicha impugnación envuelve una cuestión política no adjudicable por este Foro; que el pleito carece de varias partes indispensables —los tres (3) partidos políticos— sin cuya presencia no puede adjudicarse la controversia ni concederse el remedio solicitado por los apelantes; y que la parte promovente ha incurrido en incuria.

En fin, la decisión mayoritaria emitida en el presente recurso es una no sólo incorrecta en derecho sino que la misma constituye una grave, imprudente e indebida intervención judicial en los procesos políticos de nuestro País y con la facultad que sobre los mismos le concede la Constitución del Estado Libre Asociado de Puerto Rico a la Asamblea Legislativa.