*93 Opinión disidente emitida por el
Juez Presidente Señor Hernández Denton.
Hoy, en un claro ejercicio de activismo judicial, este Tribunal silencia las voces de miles de electores puertorriqueños que depositaron sus papeletas en blanco, las anularon en señal de protesta o, simplemente, favorecieron a una persona distinta a las que figuraban en la papeleta electoral mediante la anotación de su nombre en la columna de nominación directa. De esta forma, y fundamentándose en que estos votos fueron emitidos a favor de personajes ficticios extraídos del cine, de la televisión o de los dibujos animados, el Tribunal modifica arbitrariamente las normas que rigieron el evento electoral del pasado 4 de noviembre de 2008. Con esto se logra solamente una cosa: que el voto de miles de electores puertorriqueños NO cuente.
Por entender que dicha determinación no sólo subvierte el principio básico de que todo voto depositado en las urnas debe ser contado, sino que trastoca los valores democráticos más elementales de los cuales se nutre nuestra sociedad, respetuosamente disentimos.
I
Luego de celebrarse las elecciones generales el 4 de noviembre de 2008, el Partido Nuevo Progresista (PNP) obtuvo la mayoría de los votos depositados para el cargo de Gobernador y sus candidatos fueron electos para ocupar más de dos tercios de las bancas que componen las cámaras legislativas. Por consiguiente, se activó la llamada “Ley de Minorías”, que concede a los partidos minoritarios varios escaños adicionales para garantizarles una participación adecuada en la Asamblea Legislativa. Concluida la elección, el Partido Popular Democrático (PPD) resultó ser *94 el único partido con derecho a invocar tal disposición, ya que ni el Partido Independentista Puertorriqueño (PIP) ni el Partido Puertorriqueños por Puerto Rico (PPR) quedaron inscritos.
Posteriormente, la Comisión Estatal de Elecciones (CEE) realizó el escrutinio general ordenado por el Art. 6.008 de la Ley Electoral de Puerto Rico (Ley Electoral), 16 L.P.R.A. see. 3268. El escrutinio corroboró que tanto el Sr. Jorge Suárez Cáceres —candidato del PPD a Senador por el Distrito de Humacao— como el Sr. Angel Rodríguez Otero —candidato del PPD a Senador por el Distrito de Guayama— resultaron derrotados en sus aspiraciones de ocupar tales posiciones. Por su parte, el Sr. José Luis Dalmau Santiago, candidato a Senador por el Distrito de Humacao, solicitó a la CEE un recuento al amparo del Art. 6.011 de la Ley Electoral, 16 L.P.R.A. see. 3271, ya que solamente lo separaba un margen de menos de 0.5% de la candidata del PNP, la Sra. Mariíta Santiago.
Por esta petición, el Presidente de la CEE ordenó un recuento de los votos emitidos a favor de todos los candidatos en la papeleta legislativa para el Distrito de Humacao. No obstante, por entender que el recuento debía limitarse a los votos depositados a favor del señor Dalmau Santiago y de la señora Santiago, el Comisionado Electoral del PPD, el Ledo. Gerardo Antonio Cruz Maldonado, recurrió ante el Tribunal de Primera Instancia, Sala Superior de San Juan, para que se revocara la referida determinación. Por su parte, aunque no tenían derecho a un recuento, los señores Rodríguez Otero y Suárez Cáceres solicitaron intervenir en el pleito, porque entendían que los resultados de un proceso como ese podían afectar sus aspiraciones de ocupar el último escaño otorgado al PPD como partido minoritario.
Tras varios incidentes procesales, el señor Dalmau Santiago retiró su petición de recuento y solicitó ser certificado como Senador por Acumulación al amparo de la “Ley de Minorías”. Oportunamente, la CEE procedió a certificar al *95 Sr. Juan Eugenio Hernández Mayoral, al señor Dalmau Santiago y al Sr. Eder Ortiz Ortiz como Senadores, en conformidad con tal disposición. A su vez, tanto el señor Rodríguez Otero como el señor Suárez Cáceres reiteraron su reclamo de ocupar el último de los escaños disponibles.
Debido a la falta de consenso entre los Comisionados Electorales sobre quién debía ocupar dicho escaño, el Presidente de la CEE decidió decretar un empate entre ambos candidatos para efectos de adjudicarlo el mismo. En este sentido, el Presidente de la CEE determinó que, según el escrutinio general, el señor Rodríguez Otero obtuvo una proporción de 22.7336% del total de votos depositados en el Distrito Senatorial de Guayama (118,950/523,235), mientras que el señor Suárez Cáceres obtuvo una proporción de 22.7246% del total de votos depositados en el Distrito Senatorial de Humacao (110,777/487,476). Ambos porcentajes contemplaban, naturalmente, todas las papeletas en blanco, protestadas y por nominación directa que anula hoy el Tribunal.(1)
El Presidente de la CEE, ante tales proporciones y según su interpretación del Art. 6.012 de la Ley Electoral, 16 L.P.R.A. see. 3272, decidió eliminar las fracciones menores al 0.05% y concluyó que ambos candidatos obtuvieron el 22.7% del total de votos depositados en sus respectivos distritos. Por ende, en vista del empate surgido entre éstos, ordenó la celebración de un sorteo para llenar la vacante aludida.
Es a base de este contexto fáctico que este Tribunal ha decidido adjudicar el referido escaño al señor Suárez Cáceres, tras descartar los votos válidamente depositados por miles de electores en los Distritos Senatoriales de Humacao y Guayama. Ello aun cuando la anterior controversia *96 no está ante nuestra consideración, pues desde cualquier óptica que se observen los hechos de este caso y los argumentos de ambos candidatos en sus respectivas comparecencias, la controversia no es justiciable. Veamos por qué.
II
El pasado 29 de abril de 2009, al momento de expedirse el recurso en este caso, suscribimos un disenso en el que expusimos claramente las razones por las que entendíamos que se debía denegar el auto solicitado. Sencillamente, y en vista del accidentado cauce procesal que se ha seguido en este caso, en aquel momento no existía una disputa real entre las partes que justificara nuestra intervención. Véase Suárez Cáceres v. Com. Estatal Elecciones, 175 D.P.R. 909 (2009), voto disidente, al que se unieron la Jueza Asociada Señora Fiol Matta y la Juez Asociada Señora Rodríguez Rodríguez. Tampoco la hay ahora.
Para no extendernos demasiado sobre este particular, resumamos algunos de los puntos que señaláramos en nuestro disenso. Primeramente, y como bien sabe el Tribunal, la resolución mediante la cual se ordenó la celebración de un “sorteo” para determinar a quién le correspondía ocupar el último escaño otorgado al PPD en virtud de la “Ley de Minorías”, fue anulada por prematura mediante una sentencia del Tribunal de Apelaciones que advino final y firme. Por ende, actualmente no existe pronunciamiento alguno de la CEE que incida sobre los derechos de ambos candidatos. Es por ello que reiteradamente hemos advertido que la forma en que se ha traído este asunto a nuestra atención impide que lo resolvamos en sus méritos.
Por otra parte, en la opinión del Tribunal se reconoce que este caso nada tiene que ver con un recuento, pues los señores Suárez Cáceres y Rodríguez Otero no tienen derecho a que se les conceda uno. Sin embargo, las resoluciones que según la opinión del Tribunal “afectan” a estos dos can *97 didatos, y las que utiliza para justificar su intervención, son precisamente reglas para determinar cuándo se activa el derecho a un recuento y cómo se han de contar los votos si se ordena uno. Es decir, la controversia sobre si se deben contar las papeletas en blanco o las que tengan nombres anotados en la columna de nominación directa solamente es pertinente para determinar si se debe ordenar un recuento o no. Como ninguno de estos candidatos tiene derecho a un recuento, es evidente que ambos carecen de legitimación activa para cuestionar la validez de tales determinaciones de la CEE.
Aun así, la opinión del Tribunal pasa por alto ese hecho y presume que ambas resoluciones aplicaban al escrutinio general. No obstante, según señala la propia CEE, durante el escrutinio general de las pasadas elecciones se contabilizaron todas las papeletas en blanco y las que contenían nombres en la columna de nominación directa. En efecto, podemos tomar conocimiento de que así ha ocurrido por décadas en todas las contiendas electorales celebradas en Puerto Rico. No podía ser de otro modo. Tanto el Art. 6.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. see. 3261, y las Reglas 60, 62 y 78 del Reglamento para las Elecciones Generales y el Escrutinio General de 2008,(2) Comisión Es *98 tatal de Elecciones, 7 de julio de 2008, como la decisión de este Tribunal en Sánchez y Colón v. E.L.A. I, 134 D.P.R. 445, 450-451 (1993), así lo exigen. Dada su naturaleza, ni los Comisionados Electorales ni el Presidente de la CEE tenían discreción para alterar esta normativa.
Por lo tanto, es evidente que lo que el señor Suárez Cáceres realmente interesa impugnar es la forma en que se realizó el escrutinio general tras las elecciones del 4 de noviembre de 2008. Ese, sin embargo, no fue el motivo de su acción ante el Tribunal de Primera Instancia ni fue la razón por la cual recurrió ante nos.(3) Y es que la Ley Electoral es muy clara al disponer que los resultados del escrutinio general realizado por la CEE son definitivos y solamente pueden ser impugnados a la par que se cuestione la elección de un candidato a determinado puesto electivo. En otras palabras, para impugnar cómo se realizó el escrutinio es necesario esperar a que la CEE certifique al candidato cuya elección se desea cuestionar.
En este caso resulta más que evidente que la CEE aún no ha certificado candidato alguno para el último puesto disponible al amparo de la “Ley de Minorías”. De hecho, el proceso iniciado por la CEE a tales efectos fue declarado nulo mediante sentencia final y firme del Tribunal de Apelaciones. Por lo tanto, la impugnación pretendida por el señor Suárez Cáceres es completamente prematura y no puede ser objeto de nuestra consideración en este recurso.
III
Ante esta realidad, ¿por qué entonces la insistencia del Tribunal en atender este caso? ¿Cuál es la verdadera razón detrás de su intervención en una controversia que, como *99 hemos señalado, es totalmente fútil? Sin ambages, tanto la opinión del Tribunal como la opinión de conformidad del Juez Asociado Señor Martínez Torres, a la que se unen el Juez Asociado Señor Rivera Pérez y la Jueza Asociada Señora Pabón Charneco, nos dan la respuesta: la revocación del caso Sánchez y Colón v. E.L.A. I, supra.
En dicho caso, para evitar declarar inconstitucional el plebiscito sobre status político programado para el 14 de noviembre de 1993, resolvimos que debían adjudicarse todas las papeletas depositadas en blanco como un voto que no favorecía las definiciones de status que se consignaban en la papeleta. De esta forma, los electores que no se sintieran representados por las referidas fórmulas podían ejercer su derecho constitucional al voto haciendo constar su inconformidad con éstas. Un voto en ese sentido permitía que la ciudadanía expresara libremente su sentir, aun cuando éste no respondiera al criterio de los partidos políticos que formularon las definiciones plebiscitarias.
Al resolver de tal forma, partimos de la premisa de que en nuestro ordenamiento constitucional el poder político emana del Pueblo y, por consiguiente, se tiene que ejercer con arreglo a su voluntad. Art. I, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1. La Constitución del Estado Libre Asociado de Puerto Rico dispone una forma muy clara y eficaz de proteger la expresión de esa voluntad: el sufragio universal, igual, directo y secreto. Precisamente, a tales efectos, nuestra Carta de Derechos también impone un deber afirmativo al Estado de proteger a la ciudadanía contra toda coacción en el ejercicio de la prerrogativa electoral. Art. II, Sec. 2, Const. E.L.A., supra. Véanse, además: Suárez v. C.E.E. I, 163 D.P.R. 347, 355-356 (2004); Ramírez de Ferrer v. Mari Brás, 144 D.P.R. 141, 203 (1997); P.I.P. v. C.E.E., 120 D.P.R. 580 (1988); P.P.D. v. Admor. Gen. de Elecciones, 111 D.P.R. 199 (1981).
En Sánchez y Colón v. E.L.A. I, supra, estaban en juego tres de esos principios. Por una parte, es evidente que los *100 electores que no estaban de acuerdo con las fórmulas de status incluidas en la papeleta del plebiscito, según éste fue concebido por la Asamblea Legislativa y los tres partidos políticos principales, se enfrentaban a una disyuntiva: votar por alguna de ellas, en la esperanza de que luego podrían convencer a los partidos políticos de que adoptaran su particular visión sobre status, o, por el contrario, quedarse en sus casas y recurrir a la abstención electoral. Sin duda, esto último no era una alternativa digna ni democrática para los litigantes. Por tal razón, la consulta plebiscitaria adolecía de serios problemas de subinclusión e infringía el principio de la igual protección de las leyes en materia electoral.
Ahora bien, por otra parte, la situación a que se enfrentó este Tribunal en aquella ocasión implicaba otros dos valores de fundamental importancia en nuestra democracia: el derecho de todo ciudadano a emitir su voto de forma secreta y el derecho a así hacerlo libre de coacciones impuestas por los partidos políticos, por terceros o por el propio Estado. Ambos valores reconocen claramente que, en una democracia, la prerrogativa electoral de los ciudadanos debe depender exclusivamente de lo que les dicte su conciencia. Véase, e.g., Ramírez de Ferrer v. Mari Bras, supra, pág. 204.
Sobre el particular, es muy ilustrativo que durante la Convención Constituyente se generó un intenso debate sobre cierta propuesta para establecer en la Carta de Derechos una disposición referente al voto obligatorio. Entre las razones aducidas por varios de los delegados contra su adopción se encontraba el hecho de que sería una clara imposición del Estado obligar a los ciudadanos a expresarse sobre una u otra de las opciones presentadas en la papeleta, cuando bien podría existir una multiplicidad de opciones que no se incorporaron a ésta y que eran más afines a los ideales del elector. Por tal motivo, finalmente, la referida enmienda no fue aprobada. 2 Diario de Sesiones *101 de la Convención Constituyente de Puerto Rico, 1409-1445 (edición conmemorativa 2003).
De ese debate entre los constituyentes se desprende su convicción de que la coacción en el contexto electoral no sólo puede tomar la forma de la compulsión a votar, sino que también se manifiesta cuando se impone al electorado las opciones o los candidatos por quienes habrán de votar. Además, los Delegados eran muy conscientes de que en la campaña previa a su selección como miembros de la Convención Constituyente, el entonces Gobernador, don Luis Muñoz Marín, orientó a los puertorriqueños que no estaban de acuerdo con la asamblea a depositar sus papeletas en blanco en protesta con dicho proceso:
Me entero de que uno de los partidos políticos de Puerto Rico ha decidido no concurrir a las elecciones del 27 de agosto. No veo razón por la cual no pudieran los delegados que eligieran, con los votos que tuvieren, ir a la asamblea constituyente y plantear sus puntos de vista sobre la naturaleza de la constitución en sí y, además, ayudar a que la constitución, aunque no sea la que favorecerían si fueran mayoría, pudiera ser tal vez perfeccionada por la gestión de ellos dentro de la naturaleza de unión con Estados Unidos que es la voluntad mayoritaria.
Sin embargo, si por razones que les parezcan adecuadas no desean votar ni a favor ni en contra, me parece que el procedimiento más democrático, y el que se presta a menos reclamaciones engañosas después, es el de concurrir a las urnas y depositar las papeletas en blanco. (Enfasis suplido.) Discurso de don Luis Muñoz Marín, Gobernador de Puerto Rico, en tomo al desarrollo del pensamiento político sobre el estatus, 17 de julio de 1951.
Así, pues, ya desde ese momento nuestro Pueblo supo que votar en blanco era una manera legítima de disentir y que su voto contaría. Es precisamente por el valor democrático del voto en blanco, como manifestación del derecho de expresión, que resolvimos en Sánchez y Colón v. E.L.A. I, supra, ante un plebiscito en que prácticamente se obligaba a los ciudadanos a votar por una de tres fórmulas o a *102 quedarse en sus casas, que tenían que contarse las papeletas depositadas en blanco como un voto contra las tres definiciones de status. Lo contrario sería, simple y llanamente, permitir que el Estado encasille la voluntad del electorado según mejor le parezca a los gobernantes de turno y a los partidos políticos. Es decir, sería obligar a los electores a votar por los candidatos de determinado partido o por definiciones de status que no favorecen para que su expresión tenga consecuencias. Véase S. Issacharoff, P.S. Karlan y R.H. Pildes, The Law of Democracy: Legal Structure of the Political Process, 3ra ed., Nueva York, Ed. Foundation Press, 2007, págs. 234-236.
En fin, entre la “Partidocracia” y la Democracia, los miembros de la Convención Constituyente prefirieron la última. No obstante, hoy este Tribunal ignora el espíritu de la Constitución y la historia electoral de Puerto Rico al establecer, desde este estrado apelativo, que de ahora en adelante prevalecerá la “Partidocracia” y no se contarán los votos en blanco ni los emitidos a favor de personas que no figuren en la papeleta mediante la columna write-in.
IV
En la opinión que emite en el caso de autos, la opinión de la mayoría se muestra inconforme con la reseñada norma. Expresa, y citamos, que “la adjudicación de esa papeleta en blanco afecta seriamente o diluye el efecto y la consecuencia de los votos que se emiten a favor de las opciones presentes en la papeleta”. Opinión del Tribunal, pág. 72. No obstante, y dicho con respeto, ¿el Tribunal acaso ignora que las papeletas en blanco no llegan a las urnas por puro “arte de magia”, sino que son depositadas por electores de “carne y hueso” que tienen una plena conciencia de lo que están haciendo y que están ejerciendo su derecho de expresión a través del voto? ¿Qué alternativa *103 tendrían estos ciudadanos? ¿Abstenerse? ¿Quedarse en sus casas y dejar que otros decidan por ellos? ¿Quedarse calla-dos?
En la opinión del Tribunal no encontramos respuestas fundamentadas a estas interrogantes. Si es cierto, como afirma el Tribunal, que “Razonablemente podemos concluir que el elector que voluntariamente daña su papeleta, la deposita en blanco o vota” por alguna persona mediante la columna de nominación directa, “tuvo la clara intención de no favorecer ninguna opción o candidato de los que se encontraban en la papeleta” (Opinión del Tribunal, pág. 72), ¿por qué entonces le quitamos todo valor práctico y jurídico a su determinación? ¿Qué derecho tenemos como Jueces para acallar su voz desde este estrado apelativo so color de proteger los derechos de un partido minoritario?
A pesar de que somos conscientes de que un sector del proceso político no estuvo —ni está— de acuerdo con lo resuelto en Sánchez y Colón v. E.L.A. I, supra, eso no es motivo suficiente en derecho para revocar dicha decisión y alterar la norma que ha prevalecido desde entonces. Menos aún cuando esa norma se estableció con el fin de facilitar el uso del voto para expresar la inconformidad ciudadana con las mayorías del momento y con las opciones plasmadas en la papeleta. En esencia, se trata del reconocimiento de que el voto es un ejercicio expresivo por naturaleza y que, por lo tanto, está protegido por el derecho a la libertad de palabra. Véanse, e.g.: Dixon v. MD. State Administrative Election Laws, 878 F.2d 776, 785 esc.12 (4to Cir. 1989); Issacharoff et al., op. cit., págs. 235-236; A.M. Bickel, The Supreme Court and the Idea of Progress, Londres, Yale University Press, 1978, págs. 59-61; Nota, Expressive Voting, 68 N.Y.U. L.Rev. 330, 339-340 (1993).
Es preocupante el silencio de la opinión del Tribunal sobre las consecuencias de esta decisión para nuestro ordenamiento democrático y el Estado de Derecho establecido por nuestra Constitución.
*104 Por otra parte, como expresamos en P.P.D. v. Barreto Pérez, 110 D.P.R. 376, 380 (1980), es nuestra obligación velar por que las normas y reglas referentes a toda contienda electoral, y la forma de contar los votos, queden establecidas previamente, de manera que todos los candidatos y partidos políticos sepan a qué atenerse. Además, conforme a dicho precedente, debemos procurar que no se introduzcan cambios posteriores que afecten adversamente tales reglas, concediendo ventajas impermisibles a unos sobre otros. Por último, y en un punto que obvia la opinión del Tribunal, en dicha decisión señalamos que, terminada la votación, debe iniciarse rápidamente el conteo de votos, gestión que no debe detenerse ni dilatarse hasta que finalice con la certificación de los candidatos.
Según estos principios, la opinión del Tribunal acusa a la CEE de variar reiteradamente los criterios establecidos para regir el escrutinio general de los votos emitidos en las elecciones del 4 de noviembre de 2008. Sin embargo, como mencionáramos, las resoluciones que utiliza el Tribunal para justificar su intervención en este caso nada tienen que ver con el escrutinio general. Por lo tanto, desafortunadamente para el Tribunal, la realidad apunta hacia otra dirección.
No existe controversia alguna sobre el hecho de que en las elecciones generales celebradas hace exactamente siete meses se contabilizaron las papeletas en blanco y las que contenían nombres de personas bajo la columna de write-in. De hecho, en los Distritos Senatoriales de Humacao y Guayama, que son objeto de la controversia creada por este Tribunal, se depositaron y contabilizaron un total de 3,112 papeletas en blanco. Además, podemos tomar conocimiento judicial de que en estas elecciones hubo movimientos de ciudadanos que solicitaron organizada e intensamente el voto a favor de ciertos candidatos mediante la columna de write-in.
Realmente, en rigor, ¿podemos concluir que las personas *105 que emitieron su voto de esta manera no sabían lo que estaban haciendo? ¿Debemos privarles del derecho a que su voluntad cuente y a que su expresión tenga consecuencias? ¿Acaso es justo, razonable y, sobre todo, constitucional, tomar esa determinación a siete meses de concluido el evento electoral? La opinión del Tribunal entiende que sí, y por eso procede a descartar tales votos para determinar a quién corresponde el último escaño senatorial según la “Ley de Minorías”. Para esto hace una interpretación errada y totalmente innecesaria de la See. 7 del Art. Ill de nuestra Constitución, y resuelve que la expresión “votos depositados” no incluye las papeletas depositadas por el elector en las urnas, ya sea en blanco, protestadas o con nombres anotados en la columna de nominación directa.
Desde cualquier punto de vista, semejante ejercicio semántico es insostenible. Al parecer, se entremezcla una interpretación de la frase “votos totales depositados para esa posición” del Art. 6.011 de la Ley Electoral, supra, y el texto “votos depositados” en la citada sección de la Constitución. Si responsablemente nos ceñimos a nuestro deber constitucional de hacer valer la voluntad del elector, esa frase sólo puede significar una cosa. En conformidad con tal criterio, la frase “votos depositados” tiene que incluir toda papeleta depositada por el elector, ya sea con una cruz, en blanco, protestada o con un nombre anotado en la columna de write-in. Es decir, se deben seguir las normas que rigen el escrutinio general.
Por lo tanto, el ejercicio interpretativo de la opinión del Tribunal constituye realmente un cambio radical en las reglas que gobiernan el proceso electoral, efectuado luego de conocer los resultados de las pasadas elecciones generales. De ahora en adelante la normativa electoral estará en terreno movedizo, sujeta únicamente a la voluntad de este Foro. Ciertamente no hay que ser ni adivino ni profeta para anticipar las consecuencias nefastas de esta decisión sobre la certeza y la uniformidad que deben imperar en el proceso electoral puertorriqueño.
*106 V
Ahora bien, es necesario aclarar que coincidimos con la interpretación que hace el Tribunal sobre el texto del Art. 6.012 de la Ley Electoral, supra. Ésta no sólo es consecuente con la postura esbozada anteriormente por el Departamento de Justicia en sus opiniones, sino que también resulta adecuada en un sentido semántico. Por lo tanto, estamos de acuerdo con la opinión del Tribunal en que en este caso no procedía celebrar un sorteo, pues las fracciones en las proporciones de votos obtenidos por los candidatos Rodríguez Otero (22.7336%) y Suárez Cáceres (22.7246%) eran mayores a la mitad de uno (0.50%).
A nuestro juicio, sin embargo, si este caso fuera justiciable, ante los resultados finales que certificó la CEE luego del escrutinio general lo que procedería entonces sería que revoquemos al foro recurrido y devolvamos el caso a la CEE para que certifique al señor Rodríguez Otero como Senador por Acumulación al amparo de la “Ley de Minorías”. De una parte, en pura aritmética, éste obtuvo 8,173 votos más que el señor Suárez Cáceres, por lo que recibió un mayor respaldo del electorado. No obstante, si nos ceñimos a la fórmula proporcional que establece tanto la Constitución del Estado Libre Asociado de Puerto Rico como la Ley Electoral, también tendríamos que certificar a Rodríguez Otero como el nuevo Senador. Éste obtuvo una proporción de votos 0.009% (22.7336% v. 22.7246%) mayor que su correligionario más cercano, el señor Suárez C áceres.(4)
Sorprendentemente, el Tribunal toma otro camino y, tras modificar la reglamentación según la cual se celebró el evento electoral y se contabilizaron los votos, decide descartar las papeletas votadas en blanco o con los nombres de *107 personas bajo la columna de nominación directa para crear, artificialmente, una ventaja a favor del señor Suárez Cáceres. De esta forma, el Tribunal le da sus espaldas a lo resuelto hace casi treinta años en P.P.D. v. Barreto Pérez, supra, alterando las normas bajo las cuales se realizó el escrutinio y aplicándolas solamente a dos de los candidatos que figuraron en los pasados comicios. No podemos estar de acuerdo con tan errado proceder. ¿Por qué es que el Tribunal insiste en certificar a una persona que no obtuvo los votos necesarios para ocupar el último escaño correspondiente al PPD como partido de minoría? Si ni siquiera el propio señor Suárez Cáceres solicitó este remedio al comparecer ante nos, ¿por qué este Tribunal decide concederlo y prescindir del trámite administrativo de la CEE?
VI
Como presagiáramos en nuestro voto disidente de 29 de abril de 2009 —Suárez Cáceres v. Com. Estatal Elecciones, 175 D.P.R. 909 (2009)— el avión “caza huracanes” ha regresado. Aunque no encontró una tormenta para justificar su largo vuelo de aproximadamente un mes, su aterrizaje ha creado un huracán de cuyo embate nuestro pueblo tardará mucho tiempo en reponerse. Con su regreso, ha silenciado la voz de miles de electores puertorriqueños, descartando su expresión válida mediante las papeletas que depositaron en las urnas, como si fueran meramente papeles que vuelan en los vientos huracanados. Más aún, la decisión de este Tribunal obliga ahora a que la CEE pase juicio sobre todos los por cientos de votos que obtuvieron los candidatos que participaron en las pasadas elecciones, según la nueva normativa electoral adoptada por este Foro siete meses después de completado el escrutinio general. En fin, le corresponde ahora a la CEE computar nuevamente los resultados electorales.
*108 En un mundo de absolutos, la justicia se desvanece. La decisión que este Tribunal emite en este caso es un claro ejemplo de que ni siquiera nuestra Constitución está a salvo del criterio mayoritario. Hoy se han alterado las reglas bajo las cuales se contaron los votos en el pasado evento electoral y se ha socavado la confianza pública en los resultados de las elecciones celebradas el pasado 4 de noviembre de 2008. Esta decisión tiene el efecto de restarle valor jurídico a la expresión política de miles de electores puertorriqueños que depositaron la papeleta en blanco, o que votaron por una persona natural o ficticia mediante nominación directa, ante su insatisfacción con las opciones presentadas por los partidos políticos durante las pasadas elecciones.
Como no estamos dispuestos a anular el voto emitido por esos electores y seleccionar, desde este estrado apelativo, al candidato que debe ocupar el último escaño de un partido según la “Ley de Minorías”, respetuosamente disentimos.

 Aun cuando el Tribunal intenta limitar su decreto de nulidad a aquellos votos emitidos a favor de “personajes ficticios”, de los autos no surge información alguna sobre si la Comisión Estatal de Elecciones (CEE) hizo una distinción entre tales votos y los emitidos a favor de personas naturales para efectos de computar los resultados de las pasadas elecciones generales.

 El referido Art. 6.001 de la Ley Electoral de Puerto Rico (Ley Electoral), 16 L.P.R.A. see. 3261, dispone, en lo pertinente: “Las papeletas que aparezcan en la urna que no tengan marca alguna se harán constar como papeletas en blanco y así figurarán en la hoja de cotejo.” (Énfasis suplido.) Además, en la Regla 60 del Reglamento para las Elecciones Generales y el Escrutinio General de 2008, Comisión Estatal de Elecciones, 7 de julio de 2008, pág. 75, se establece el procedimiento que debe seguirse para contabilizar tales papeletas, de modo que se preserve la intención del elector:
‘Deberán examinar bien que las papeletas votadas en blanco no tengan marca válida alguna. Una vez verificado, procederán a trazarle una línea horizontal de un extremo a otro de la papeleta por debajo de las insignias de los partidos políticos para inutilizarlas. Sobre la faz de éstas se les escribirá VOTADA EN BLANCO’, cuidándose que no se haga sobre éstas ninguna otra marca o puntos con los bolígrafos. Dichas papeletas deberán ser firmadas por todos los Inspectores de Propiedad. La cantidad de éstas se anotará en el espacio correspondiente en el ‘cuadre de colegio’y se colocarán aparte en el sobre correspondiente, el cuál se guardará dentro del maletín de material electoral.” (Énfasis suplido.)
Por último, y en relación con lo anterior, la Regla 62 del citado reglamento, supra, pág. 75, establece que las papeletas votadas en blanco deben incluirse en la *98 suma total de votos, pues ésta debe coincidir con el total de papeletas depositadas por los electores en las urnas.

 Más bien, éste expresa en sus señalamientos de error que el Tribunal de Apelaciones incidió al resolver que el foro de instancia carecía de jurisdicción.

 Ello es así incluso si se computaran las proporciones sin los votos declarados nulos por la CEE. En tal caso, el señor Rodríguez Otero aventajaría al señor Suárez Cáceres por un 0.006% (22.7826% v. 22.7766%).